Filed 10/24/16; pub. order 11/15/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

KATHY LEE,

    Plaintiff and Appellant,

        v.

WEST KERN WATER DISTRICT et al.,

    Defendants and Appellants.

F070772

(Super. Ct. No. S-1500-CV-277481)

**OPINION**

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Lorna H. Brumfield, Judge.

R. Rex Parris Law Firm, R. Rex Parris, Alexander R. Wheeler, Kitty Szeto, John M. Bickford; Dake, Braun & Monje, Stephen M. Dake and Craig M. Braun for Plaintiff and Appellant.

Clifford & Brown, Arnold J. Anchordoquy, John R. Szewczyk, and Nicholas J. Street for Defendants and Appellants.

-ooOoo-

This case involves the applicability of the workers' compensation exclusivity rule to an unusual set of facts.  This rule governs the matter of when an injured worker can

bring a civil action against the employer and when he or she is instead limited to the remedy of a workers' compensation award.

Plaintiff Kathy Lee, an employee of defendant West Kern Water District (district), sued the district and four coemployees for assault and intentional infliction of emotional distress after the coemployees staged a mock robbery with Lee as the victim. In the mock robbery, one of the district's managers entered the district's office in a mask and confronted Lee at the cashier's window with a note demanding money and saying he had a gun. Lee, who had not been informed of the planned mock robbery, handed over the money and subsequently was treated for psychiatric injury. The jury awarded her $360,000.

The trial court denied defendants' motion for judgment notwithstanding the verdict but granted their motion for a new trial. It concluded it had given the jury an inappropriate instruction on the workers' compensation exclusivity rule.

Lee appealed from the order granting a new trial. Defendants appealed from the denial of their motion for judgment notwithstanding the verdict.

We will reverse the new trial order. The jury instructions were not erroneous. Alternative grounds for affirmance proposed by defendants lack merit. We will affirm the order denying the motion for judgment notwithstanding the verdict.

### FACTS AND PROCEDURAL HISTORY

*The complaint*

According to the operative complaint, Lee was employed as a cashier at the district's office, working behind a partition where customers came to pay their water bills, often in cash. Also employed by the district were accounting supervisor Ginny Miller, safety manager Sam Traffenstedt, quality control manager Gary Hamilton, and general manager Harry Starkey. The district provided its employees with some training on how to respond to a robbery. The complaint alleged that these four supervisors formed a plan to test how the district's female employees would respond if they believed

2.

they were really being robbed. On July 29, 2011, male employees were given pretextual reasons to be away from the office. Lee and three other women were left working in the office. While Lee was at the front counter, Hamilton entered the office wearing a ski mask, sunglasses, and a hat. He approached Lee, put a paper bag on the counter, and pointed at it. On the bag was written the message "I HAVE A GUN[.] PUT YOUR MONEY IN THE BAG[.]" Fearing for her life, Lee complied as Hamilton made threatening gestures. Meanwhile, Miller was outside telling customers not to come in and Traffenstedt and Starkey were watching the mock robbery via surveillance video. Hamilton ran out the door with the bag of money. Then Miller, Traffenstedt, and Starkey came into the lobby and announced that the robbery was simulated.

The complaint alleged that after the robbery, Lee was crying, shaking, and nauseous and finally had to go home. She later suffered from fears, depression, nightmares, headaches, loss of appetite, and ongoing nausea. She sought psychological treatment and had to use all her accrued sick leave and vacation time during an extended absence from work.

The complaint alleged causes of action against all defendants for intentional infliction of emotional distress and assault. A third cause of action under the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) is not at issue on appeal. The complaint also asserted that Hamilton's conduct amounted to a criminal threat in violation of Penal Code section 422, although no cause of action was specifically connected with this assertion.

***The evidence at trial***

The case was presented to the jury in two phases. In the first phase, the jurors were required to determine whether Lee's claims were barred because her sole remedy was a workers' compensation award. In the second, if the claims were not barred, the jury was required to determine defendants' liability and assess damages. The issues on appeal involve only the first phase.

3.

Lee testified she was at work at her desk on the morning of the robbery. Around 8:45 a.m., she had finished preparing a bank deposit and was walking past Miller's office. Hamilton and Traffenstedt were with Miller in her office, a circumstance Lee found unusual because the three of them did not ordinarily work together and were stationed in different parts of the building. Later, back at the front counter, Lee saw the masked man who turned out to be Hamilton coming into the lobby. She believed it was a real robbery and was terrified. He shoved a bag though the opening of the glass partition and pointed to the message written on it: "I have a gun. Give me your money." When she reached under the counter for the alarm button, Hamilton saw, pounded on the counter, and pointed again to the message. Shaking, Lee fumbled while taking the money out of the drawer and putting it in the bag. Hamilton pounded the counter again. She gave him the bag and he ran out the front door.

Applying training she had received, Lee looked to see which way Hamilton ran, and then wrote out a description of the robber. Soon an employee named Deann Gregory entered the lobby and announced that the robbery had been an exercise. Starkey or Traffenstedt next appeared and said the same. Lee was stunned and felt betrayed.

Lee testified that Traffenstedt then told her to go into an office and wait. After a while, Starkey appeared and asked if she wanted her husband to come and help her calm down. Lee's husband was also an employee of the district. She waited with her husband, crying, for about 15 minutes. Starkey asked her to move to another room. She remembered talking to a police officer there. Then she went to Miller's office where she saw Hamilton. Hamilton cried, hugged Lee, and said he was sorry. Eventually, Lee resumed working, but she continued to be upset and went home an hour early at the suggestion of her husband.

The mock robbery took place on a Friday. On Saturday, Lee received phone calls from Miller and Starkey. Miller said the robbery had not gone as planned. Starkey asked if he could come to Lee's house. When he arrived, he also said the robbery did not

4.

happen as intended; the plan had been not to use a disguise and to tell everyone in advance that it was a training exercise.

Miller, Hamilton, Traffenstedt, and Starkey all testified that they participated in planning the mock robbery. Miller said she and Traffenstedt agreed it was important for the robbery to appear realistic and that the people working in the office should not know it was not real. They planned to have Miller's nephew play the robber. He would not need to be disguised because the other employees did not know him. The nephew declined to take the part, so Miller asked Hamilton to do it with a mask. Miller, Traffenstedt, and Hamilton worked out the plan to have Hamilton use a message written on a bag so the other employees would not identify him by his voice. On the morning of the mock robbery, Miller told Starkey that that would be the day, and Starkey said okay. Miller's job during the robbery was to stand outside to make sure no customers were coming in. She wanted to avoid upsetting or traumatizing customers by exposing them to the mock robbery.

Miller testified that the robbery went exactly as planned, although Lee looked distraught and shaken. Miller had intended Lee to believe it was a real robbery. She said she never intended to traumatize Lee, but conceded she did nothing in planning the robbery to take Lee's well-being into account.

After the mock robbery, Miller shredded the bag with the message written on it. The next Monday, she and the other employees were ordered not to discuss the mock robbery with anyone.

Miller said she was later reprimanded for her part in the mock robbery. If she had it to do over, she would have arranged to have the employees know what was happening in advance.

On cross-examination by her attorney, Miller testified again that she never had any plan or intention of hurting Lee. She did not know which employee would be at the counter when Hamilton went in. When planning the mock robbery, she considered that

the employees were experienced, had often encountered difficult customers, and would "be okay" if they believed they were being robbed. Miller also testified that she never told Starkey, the general manager, that Hamilton would be masked during the robbery.

Hamilton testified that Miller and Traffenstedt recruited him to participate in the mock robbery the day before he did it. The three of them discussed how he would use the disguise and the bag with the note about the gun so that the employees would not recognize him. The plan was for the employees to believe the robbery was real and that he really had a gun. Hamilton was uncomfortable with the plan because he was worried someone would call the police and he might get shot. He wanted Miller to find someone else to play the robber, but she did not, so he agreed to do it because Miller was his close friend and he wanted to help her. Before the mock robbery, Hamilton discussed it with Starkey, because he felt a supervisor should give his consent before he went ahead. Hamilton did not mention the mask to Starkey. Starkey gave his approval. The mock robbery was accomplished just as Hamilton, Miller, and Traffenstedt had planned. While it was happening, Lee looked startled, frightened and confused, but Hamilton did not consider revealing the truth to her, because Miller had told him not to do so.

Hamilton testified he was concerned for his own welfare, but it did not occur to him that the victims of the mock robbery would be frightened or harmed. He gave no thought to how Lee would be affected. He had no intention of harming or traumatizing anyone. He apologized to Lee afterward. Hamilton testified that he was later reprimanded by Starkey for his role in the mock robbery. Hamilton felt this was inappropriate, since Starkey and the other managers knew and approved of the plan in advance.

Starkey testified that he was the general manager of the district with overall responsibility for its operations. The idea for the mock robbery originated with him, but what happened did not resemble what he intended. His original idea was that he or the district's finance director, Sunny Kapoor, would approach the counter without a disguise

or a note and tell the employees they were conducting an exercise. Then the employees would be asked, one at a time, to push the alarm button under the counter. The purpose of the exercise, as Starkey intended it, was merely to test the alarm buttons at each window and make sure the employees knew where the buttons were. The employees had had some other training, including a visit from the police, to prepare for possible robberies, and the exercise Starkey had in mind would further help employees to be ready in case of a robbery.

Starkey delegated the planning of this exercise to Dawn Cole, the district's director of business administration. Starkey later learned that Cole had delegated her role in the matter at least partially to Traffenstedt and Miller. Starkey received an e-mail message from Cole stating that Miller was going to be the "fake robber," but he thought she would not be disguised and the employees would know the robbery was fake. On the morning of the mock robbery, Traffenstedt told Starkey he had coordinated with the alarm company and the police department. Also that morning, Hamilton came to Starkey to say he was going to play the robber, not Miller. Hamilton said he was uncomfortable with the plans, but did not mention the details. Something about this conversation made Starkey uneasy, but he still did not know the others planned to enact a realistic robbery with a mask, a note about a gun, and no warning to the workers at the counter. He consented to Hamilton playing the robber without knowing how it was going to be done. If he had known, he would have stopped it. After the mock robbery, Starkey apologized to Lee. He never intended her to believe it was a real robbery.

Starkey watched a video recording of the mock robbery. Having seen it, he agreed that Lee was justified in being scared. He said he took responsibility for the harm Lee suffered. The recording was later erased.

When Traffenstedt testified, Lee's counsel asked, "You were the point person in charge of this staged robbery; right? It was your gig. It was your thing." Traffenstedt answered, "Yes." He denied, however, that he knew in advance that Hamilton would be

7.

wearing a mask or using a bag with a note written on it. He intended to have a supervisor approach the counter without a disguise and explain to the employees working at the counter that they were doing an exercise on how to respond during a robbery. He did not learn that Hamilton had been disguised or had used a note saying he had a gun until later in the day, after the mock robbery took place. When asked whether customers were kept out of the lobby during the exercise to ensure they would not be "terrorized" by it, Traffenstedt said no. Lee's counsel then impeached him with a video recording of his deposition, in which he said yes to the same question. Traffenstedt also testified that after he learned the exercise had gone far differently than he planned, he did not ask anyone anything about how or why this had happened.

Traffenstedt said he contacted the Taft Police Department and the alarm company before the mock robbery. He wanted the police to send an officer to interview the employees afterward, "so the employees have an opportunity to get a feel for that side of what would be happening after a live event ...." The police department agreed. Traffenstedt let the alarm company know they would be conducting an exercise involving the pushing of an alarm button.

Traffenstedt testified that he was disciplined for his role in the mock robbery. His pay was docked and he had to move to a different office. He said that if he had it to do over, he would get clearer instructions from Starkey and would have involved only himself and his superiors. He conceded that Lee was harmed but said he never intended to harm her and had considered her a friend.

Taft Police Chief Edward Whiting testified for Lee. At the time of the mock robbery, Whiting was a police lieutenant. On the morning of July 29, 2011, he got a call from the police dispatcher saying there was a report of a robbery in progress at the West Kern Water District. As he was driving there, he got another call from the dispatcher, who said it might not be a real robbery after all, but some kind of exercise instead. When

8.

he arrived, he met with Traffenstedt, who confirmed a mock robbery had been conducted as a training exercise.

Whiting testified to his opinion that the exercise had been dangerous. He said a high-stress event like a robbery could lead to someone having a heart attack, and people could get injured by falling over furniture and the like when trying to get away. Further, someone could have been killed if an armed bystander or a passing police officer had witnessed the robbery. At the time, Whiting expressed these views to Traffenstedt, who was "not happy" to hear them.

Whiting denied the police department had received advance notice of the mock robbery. Traffenstedt had left a voice mail message for a sergeant the night before, but the sergeant was on vacation and would not have received the message until after the mock robbery. If Whiting had known in advance of a plan to conduct a realistic mock robbery with a disguised person playing the robber and threatening to use a gun on an unwitting employee, he would have intervened to prevent it from happening.

On cross-examination, defense counsel confronted Whiting with a police department report indicating that another officer arrived at the district's office about 20 minutes before Whiting and left the office around the same time as Whiting. Whiting did not remember seeing the other officer there and did not know if he went because the district had asked an officer to come in advance.

### The jury instructions

The court's charge to the jury included a pattern instruction, CACI No. 2800, on the conditions described in Labor Code section 3600. These are the conditions under which the workers' compensation system provides the sole remedy for an industrial injury. As read to the jury, the instruction stated:

> "Defendants claim that they are not responsible for any harm that Kathy Lee may have suffered because she was the defendants' employee and, therefore, can only recover under California Workers' Compensation Act. To succeed, the defendants must prove the following:

9.

"One, that Kathy Lee was defendants' employee;

"Two, that the defendant had workers' compensation—compensation insurance covering Kathy Lee at the time of the injury; and

"Three, that Kathy Lee's injury occurred while she was performing a task for or related to the work the defendants hired her to do.

"Any person performing services for another, other than as an independent contractor, is presumed to be an employee."

Lee claimed that, even if the facts satisfied the Labor Code section 3600 conditions for an exclusive workers' compensation remedy, she could still recover damages in this lawsuit because an exception applied, the assault exception of Labor Code section 3602, subdivision (b)(1). To allow the jury to make findings under this theory, the court instructed it with a version of CACI No. 2801. The version read to the jury, which reflected certain factual admissions by defendants, was as follows:

"Kathy Lee claims that she was harmed because the West Kern Water District's employees—Gary Hamilton, Sam Traffenstedt, Ginny Miller, and Harry Starkey—assaulted her. To establish this claim, Kathy Lee must prove all of the following:

"One, that Gary Hamilton, Sam Traffenstedt, Ginny Miller, and Harry Starkey engaged in conduct that a reasonable person would perceive to be [a] real, present, and apparent threat [of] bodily harm;

"Two, that Gary Hamilton, Sam Traffenstedt, Ginny Miller, and Harry Starkey intended to harm Kathy Lee;

"Three, all defendants have admitted that Kathy Lee was harmed; and

"Four, all defendants have admitted that their conduct was a substantial factor in causing Kathy Lee's harm."[1]

---

[1]The wording of items three and four of the instruction as given seems to suggest that Lee had to prove defendants made these admissions. It is clear from discussions between the court and parties, however, that they all intended this instruction to convey the idea that these two points were conceded by the defense and no proof was needed.

An instruction was also given in accordance with CACI No. 2810 to allow the jury to find Lee's claims against the individual defendants barred by the workers' compensation exclusivity rule because they were Lee's coemployees. This instruction stated that the individual defendants would have to prove (1) Lee and the individual defendants were all employees of the district; (2) the district had workers' compensation insurance covering Lee; and (3) the individual defendants were acting within the scope of their employment when Lee was harmed.

A final instruction pertaining to the applicability of the exclusive workers' compensation remedy was special instruction No. 5, requested by Lee and objected to by defendants. This instruction was based on *Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 701 (*Fermino*), which we will discuss in detail later in this opinion, and stated as follows:

> "Employer conduct is considered outside the scope of the workers' compensation scheme when the employer steps outside of its proper role or engages in conduct unrelated to the employment."

### Closing arguments

In his closing argument for the first phase of the trial, Lee's counsel urged the jury to find the defense did not carry its burden under CACI No. 2800—and therefore the exclusive remedy provisions of the Workers' Compensation Act did not apply—because the evidence showed her injury did not occur while she was performing a task for or related to the work defendants hired her to do, as required by the third element of the instruction. This, counsel said, was because being an unwitting participant in a mock robbery, as the victim, was not part of the work the water district hired her to do. In support of this argument, counsel cited special instruction No. five. He said the employer stepped outside its proper role because it made Lee believe her life was in danger from an armed robber and also because it created dangerous conditions as described by Chief Whiting.

11.

Next, Lee's counsel argued that, even if the jury found under CACI No. 2800 that defendants did prove the Workers' Compensation Act applied, it should go on to apply CACI No. 2801 and find that the assault exception applied. He said it was clear the first element of that instruction applied because all the evidence indicated a reasonable person subjected to the mock robbery would have believed she was in present danger of bodily harm. The third and fourth elements were conceded by the defense. On the second element, intent to harm, counsel argued the jury should reject the defendants' testimony that they meant no harm and instead find that people who knowingly made a coworker believe she was being robbed by a stranger with a gun must have meant to harm her.

When Lee's counsel finished his argument, defense counsel asked to be heard outside the presence of the jury. The jury was excused and defense counsel asked the court for a directed verdict on the issue of whether the Workers' Compensation Act applied. It must apply, he said, because Lee had in fact applied for and received a workers' compensation award. The jury should decide only whether the assault exception also applied. Lee's counsel then argued that it remained open to the jury to find Lee was not performing a job-related task when she was injured and therefore the Workers' Compensation Act did not apply, despite the prior award. The court denied the defense request and brought the jury back in.

Defense counsel argued to the jury that it could find Lee's claims were not barred by the Workers' Compensation Act only if it applied the assault exception; and it could apply that exception only if it found defendants intended to harm Lee. He said this would be an unreasonable conclusion because the individual defendants had no reason to want to harm Lee and all testified they did not intend to harm her.

Addressing CACI No. 2800, defense counsel contended the jury could not reasonably find the Workers' Compensation Act did not apply. He said Lee "obviously" was doing a task related to her job when she was injured. She was at the front counter

working.  Defense counsel also said it would be "therapeutic" for Lee if the jury returned a defense verdict.

During his rebuttal argument, Lee's counsel again connected special instruction No. five (the workers' compensation exclusive remedy did not apply if the employer stepped outside its proper role) with the third element of the CACI No. 2800 instruction (the exclusive remedy applies if the injury happened while Lee was doing a task related to her job).  "If you found out that what they did … that day falls outside of what a normal employer is supposed to do, you check no on [the space on the verdict form for the third element of CACI No. 2800]."

The court's post-argument instructions to the jury included the following:  "[Y]ou are not to consider whether or not the plaintiff, Kathy Lee, received workers' compensation benefits as a result of the incident which is the subject matter of this lawsuit in determining the issues in this case."  This instruction was based on a portion of CACI No. 3963.

***Jury deliberations and verdict***

During the jury's deliberations, the defense made a motion for a directed verdict on two points.  First, it asked the court to tell the jury the evidence did not allow a finding that defendants intended to harm Lee.  Then it asked the court to tell the jury to answer yes to the question on the verdict form corresponding to the third element in CACI No. 2800 (i.e., whether Lee was doing a task related to her job when she was injured).  The court denied the motion on both points.

During its deliberations, the jury sent a question to the court:  "The jury would like some clarification as to the phrase 'performing a task.'  Does that mean standing at her desk or her unknowing participation in the mock robbery?  This question is related to question #3 on the special verdict form [i.e., the question corresponding to the third element of CACI No. 2800]."  The court observed that this question "kind of went right to the heart" of the case.  It provided the following answer in writing:

13.

> "The issue of whether or not the plaintiff was performing a task for or related to her work is up to you to decide.

> "Conduct is related to work if it is reasonably related to the kinds of tasks that the employee is employed to perform or is reasonably foreseeable in light of the employer['s] business or the employee's responsibility."

The second sentence was taken from CACI No. 3720.

The first three questions on the verdict form for phase one were for determining whether the case fell within the ambit of the Workers' Compensation Act: (1) whether Lee was an employee of the district; (2) whether the district had workers' compensation insurance covering Lee; and (3) whether Lee was performing a task for or related to the work for which the district hired her. Questions four and five asked, separately for each individual defendant, about the elements of the assault exception to the workers' compensation exclusive remedy: (4) whether each defendant engaged in conduct a reasonable person would perceive to be a real, present and apparent threat of harm; and (5) whether each defendant intended to harm Lee. Question six asked whether each individual defendant engaged in a conspiracy to commit an assault.

The jury answered yes to questions one and two and no to question three. Because the negative answer to question three meant the case fell outside the Workers' Compensation Act, the verdict form directed to foreperson to skip the remaining questions and sign the form. The jury thus returned a verdict for Lee on phase one.

Further evidence was presented in phase two, and the jury returned a further verdict. It made affirmative findings on the elements of assault for each individual defendant except Starkey, but it found that all individual defendants, including Starkey, conspired to commit the assault. It made affirmative findings on the elements of intentional infliction of emotional distress for each individual defendant except Starkey, and found that each individual defendant except Starkey conspired to commit intentional infliction of emotional distress. Each individual defendant was found to be acting within the course and scope of his or her employment during the mock robbery. The jury

14.

assessed past noneconomic damages of $175,000 and future noneconomic damages of $185,000, for a total of $360,000.

***Motions for judgment notwithstanding the verdict and new trial***

Defendants filed a motion for judgment notwithstanding the verdict and a motion for a new trial. The motions were accompanied by a request for judicial notice of documents from the file in Lee's workers' compensation case. These documents indicated that on September 17, 2013, a workers' compensation judge awarded Lee $57,721.38 based on a 53 percent permanent disability determination. The award was based on several stipulations by the parties. One of these was that Lee sustained a psychiatric injury "arising out of and in the course of employment" on July 29, 2011, the date of the mock robbery.

The central argument of defendants' two motions was that, because of that stipulation, judicial estoppel should bar Lee from claiming her injury did not occur while she was performing a task related to her job. In the motion for judgment notwithstanding the verdict, defendants asserted that the stipulation in the prior proceeding, combined with the findings made by the jury, precluded the possibility that the case fell outside the ambit of the Workers' Compensation Act. In the motion for a new trial, defendants argued that, because Lee should have been barred from arguing that she was not performing a task related to her job when she was injured, the jury instruction based on CACI No. 2800 and special jury instruction No. 5 were given in error: Both of those instructions allowed the jury to find Lee was not doing a task related to her job when she was injured.

The trial court issued a written ruling on both motions on October 20, 2014. It rejected defendants' argument that judicial estoppel prevented Lee from claiming she was not performing a task related to her job when she was injured. Judicial estoppel is an affirmative defense that must be pleaded by a defendant. Defendants did not plead judicial estoppel in their answer and never sought leave to amend their answer, even

15.

though Lee's opposition to defendants' motion for summary judgment included an argument that she was not acting in the course and scope of her employment when injured. This failure meant the judicial estoppel defense was forfeited.

Despite this conclusion, the court granted the motion for a new trial. Relying on an argument not mentioned in the parties' briefs, the court found that Lee's complaint "pleads facts which place [her] in course and scope (Paragraph 21) and alleges that workers' compensation applies by pleading that her causes of action fall into the exceptions contained in Labor Code sections 3601 and 3602 (Paragraph 41)." Paragraph 21 of the operative complaint states that, at the time of the mock robbery, Lee "was working the front counter at the District's Office." Paragraph 41 alleges, "Plaintiff is further informed and believes and, based thereon, alleges that the intentional conduct of the Defendants and all of them falls within the assault exemptions to the California Workers' Compensation Laws found in California Labor Code sections 3601 and 3602." In the trial court's view, these statements amounted to an admission that the exclusive remedy provisions of the Workers' Compensation Act applied to the case and barred recovery in a civil action unless the statutory exception for assault also applied.

The trial court reasoned that, because the complaint conceded the workers' compensation exclusivity rule applied unless the assault exception was proven, the jury should not have been instructed with CACI No. 2800, which said the defense had to prove the elements of the exclusivity rule. Instead, the jury should have been told the exclusivity rule applied unless Lee established the assault exception. (The ruling did not discuss special instruction No. 5, which also gave the jury a way to find the case to be outside the Workers' Compensation Act.)

The court denied defendants' motion for judgment notwithstanding the verdict. It wrote that it could not "find that only one reasonable conclusion could be discerned from the evidence," but did not elaborate.

16.

## *DISCUSSION*

### *I.      New trial motion*

Lee maintains the trial court was mistaken when it granted the new trial motion on the grounds that the CACI No. 2800 instruction should not have been given because Lee had admitted in the complaint that she was doing her job at the time of the mock robbery, and that the complaint made an admission by mentioning the assault exception.  We agree.

#### *A.      Law on new trial motions*

The grounds upon which a motion for a new trial can be granted are set forth in Code of Civil Procedure section 657:

> "1.      Irregularity in the proceedings … by which either party was prevented from having a fair trial.
>
> "2.      Misconduct of the jury ….
>
> "3.      Accident or surprise ….
>
> "4.      Newly discovered evidence ….
>
> "5.      Excessive or inadequate damages.
>
> "6.      Insufficiency of the evidence to justify the verdict or other decision, or the verdict or other decision is against law.
>
> "7.      Error in law, occurring at the trial and excepted to by the party making the application."

The same statute further provides that an order granting a new trial must be affirmed on appeal if it should have been granted on any ground stated in the motion, even a ground not relied on by the trial court, except when the asserted ground for affirmance is insufficiency of evidence or excessive or inadequate damages.  In those instances, the trial court's order must state those grounds and "it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in

17.

said order … and such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons."  (Code Civ. Proc., § 657.)

The trial court's order did not say which of the seven bases it was relying on. Defendants' brief suggests it would be ground 1 (irregularity of proceedings), 6 (insufficiency of evidence), or 7 (error of law).  We cannot affirm based on a finding of insufficiency of evidence, however, because the trial court did not state that basis in its order.  We could affirm based on the theory that the giving of CACI No. 2800 was an error of law or perhaps that the giving of it was an irregularity that prevented defendants from having a fair trial.  We also could affirm based on any other ground stated in the motion, if meritorious.

"A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion.  '"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears."'  [Citation.]"  (*People v. Davis* (1995) 10 Cal.4th 463, 524.)  Nevertheless, when we apply the abuse-of-discretion standard in an appeal from an order granting a new trial, "any determination underlying any order is scrutinized under the test appropriate for such determination."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 859; see also *People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10; *Douglas v. Fidelity National Ins. Co.* (2014) 229 Cal.App.4th 392, 407.)  Here, the ruling was based on a determination of the correctness of the jury instructions, and this in turn was based on a determination of the legal effect of statements in the complaint.  The de novo standard of review applies to both these determinations (*People v. Waidla* (2000) 22 Cal.4th 690, 733 [jury instructions]; *Kapsimallis v. Allstate Ins. Co.* (2002) 104 Cal.App.4th 667, 672 [rulings on pleadings, such as on motion for judgment on pleadings or demurrer]), although in the new-trial context we must still give the trial court's order "the benefit of the doubt" (*Ault, supra,* at p. 1266).

18.

### B.     The workers' compensation exclusivity rule

The workers' compensation exclusivity rule is the rule, embodied in Labor Code sections 3600, 3601 and 3602, that with certain exceptions, an injury sustained by an employee arising out of and in the course of his or her employment is compensable by way of a workers' compensation insurance award only, not by a tort judgment.

#### 1.     Conditions of compensation

Labor Code section 3600 provides that, with exceptions, workers' compensation liability exists "in lieu of any other liability whatsoever" "against an employer for any injury sustained by his or her employees arising out of and in the course of the employment" if specified "conditions of compensation concur .…" (Lab. Code, § 3600, subd. (a).)  There are eight conditions of compensation.  Of significance here are conditions 2 and 3:  "Where, at the time of injury, the employee is performing service growing out of and incidental to his or her employment and is acting within the course of his or her employment" (*id.*, subd. (a)(2)); and "Where the injury is proximately caused by the employment, either with or without negligence" (*id.,* subd. (a)(3)).

The requirements that an injury arise out of employment or be proximately caused by employment are sometimes referred to together as the requirement of industrial causation.  (*Nash v. Workers' Comp. Appeals Bd.* (1994) 24 Cal.App.4th 1793, 1809.)  It is a looser concept of causation than the concept of proximate cause employed in tort law. In general, the industrial causation requirement is satisfied "if the connection between work and the injury [is] a contributing cause of the injury .…"  (*Ibid.*)

The requirement that the employee be acting in the course of employment is different:  It generally means the injury happened at a time when the employee was working and in the place of employment.  (*Atascadero Unified School Dist. v. Workers' Comp. Appeals Bd.* (2002) 98 Cal.App.4th 880, 883.)  It further requires that the employee, when injured, was doing ""'those reasonable things which his contract with

19.

his employment expressly or impliedly permits him to do."'"" (*Maher v. Workers' Comp. Appeals Bd.* (1983) 33 Cal.3d 729, 733.)

For our purposes here, it is important that "arising out of" and "in the course of" are two separate requirements. Even if it is conceded that an employee was injured while performing job tasks in the workplace during working hours, the exclusivity rule applies only if it also is shown that the work was a contributing cause of the injury.

### 2.    *Statutory exceptions to the rule*

Labor Code section 3602, subdivision (a), repeats the rule that workers' compensation benefits are the exclusive remedy for industrial injury. Subdivision (b) of that section lists three exceptions to the exclusivity rule. The one pertinent here is: "Where the employee's injury or death is proximately caused by a willful physical assault by the employer." (Lab. Code, § 3602, subd. (b)(1).) Subdivision (c) makes explicit the converse of the exclusivity rule, i.e., that ordinary civil remedies apply to injuries falling outside the workers' compensation system: "In all cases where the conditions of compensation set forth in Section 3600 do not concur, the liability of the employer shall be the same as if this division had not been enacted." (Lab. Code, § 3602, subd. (c).)

Labor Code section 3601 extends the exclusivity rule to bar tort actions against coemployees who cause injury while acting in the scope of employment.

### 3.    *Intentional torts and the* **Fermino** *doctrine*

In most jurisdictions, the workers' compensation exclusivity rule does not cover intentional torts like those alleged by Lee in this case. (*Fermino, supra,* 7 Cal.4th at p. 709.) In California, the rule is more complicated, as the above discussion indicates: The rule bars recovery in a tort action for *any* injury happening under the stated conditions of compensation unless an exception applies. This means that some injuries caused by intentional torts remain subject to the exclusive workers' compensation remedy.

Our Supreme Court explained the law in *Fermino*. On one hand, Labor Code section 3600 frames the exclusivity rule in general terms (any injury) without ruling out intentional torts. Likewise, Labor Code section 4553 establishes a special rule for injuries caused by an employer's "serious and willful misconduct"; in such cases, the employee's workers' compensation award is to be "increased [by] one-half." Thus, at least some intentional torts are included within the exclusive workers' compensation remedy, with a premium added to the recovery (although case law holds that serious and willful misconduct in this context is not quite the same as intentional wrongdoing and instead involves an intermediate form of fault somewhere between negligence and intent). On the other hand, Labor Code section 3600 makes a point of stating that the exclusive remedy applies "without regard to *negligence*" (Lab. Code, § 3600, subd. (a), italics added), indicating that the Legislature was focused mainly on setting up a system to compensate workers whose injuries arose without fault or through negligence and did not intend to deal comprehensively with injuries caused by intentional torts. (*Fermino, supra*, 7 Cal.4th at pp. 709-710.)

When are intentional torts within the Workers' Compensation Act, then, and when are they not? Case law developed to try to answer this question, as the *Fermino* court explained. *Conway v. Globin* (1951) 105 Cal.App.2d 495, 498, held that an intentional assault was not within the exclusivity rule. *Unruh v. Truck Insurance Exchange* (1972) 7 Cal.3d 616, 630, held that a workers' compensation insurer, standing in the shoes of the employer, was not shielded by the exclusivity rule from an action for fraud. *Johns-Manville Products Corp. v. Superior Court* (1980) 27 Cal.3d 465, 474-476, held that the exclusivity rule did not bar an action for fraudulent concealment where the employer willfully withheld information from the employee's physician about the employee's asbestos-related illness. (*Fermino, supra*, 7 Cal.4th at pp. 710-712.) In 1982, the Legislature ratified some of the case law by adding to Labor Code section 3602 the

21.

exception for willful assault and an exception for fraudulent concealment of an injury. (*Fermino, supra* at p. 712, fn. 3.)

In *Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, the Supreme Court considered whether a claim of intentional infliction of emotional distress fell within the exclusivity rule. The employee alleged that he had been unfairly demoted to a position in which he had to perform humiliatingly menial duties. In the Supreme Court's view, reviewing and disciplining employees was a normal part of the employment relationship and could not be brought outside the exclusivity rule by a showing that the employer intentionally caused harm through it. (*Fermino, supra*, 7 Cal.4th at pp. 712-713.) To hold otherwise would create too large an exception to the exclusivity rule, because "an employer or supervisor is generally in a position that gives him power to damage the employee's interests through ordinary acts of discipline, and must often act with the recognition that such acts will cause the employee mental distress." (*Id.* at p. 713.)

In *Hart v. National Mortgage & Land Co.* (1987) 189 Cal.App.3d 1420, 1430, the Court of Appeal distinguished *Cole* and held that a claim of intentional infliction of emotional distress was not barred by the exclusivity rule. The plaintiff was subjected to a persistent campaign of harassment that included physical molestation and deliberate humiliation. This behavior could not be considered a normal risk of employment. (*Fermino, supra*, 7 Cal.4th at p. 714.)

In *Fermino* itself, the plaintiff sued her employer for false imprisonment. She was a sales clerk accused by her personnel manager of stealing $4.95. According to the complaint, the sales manager, the loss-prevention manager, and two security agents called her into a room and interrogated her. They claimed two witnesses saw her commit the theft. She was told they would count one point each time she denied guilt. When there were 14 points, they would call the police. They shouted profanities at her over her insistent denials and blocked her way when she tried to leave. After an hour, she broke

22.

down in tears and her interrogators admitted no one witnessed her committing theft. They said they believed her and let her go. (*Fermino, supra*, 7 Cal.4th at pp. 706-707.)

The Supreme Court held that the suit was not barred. It rejected the notion that the 1982 amendments to Labor Code section 3600, listing specific exceptions to the exclusivity rule, were "intended to provide an exhaustive list" of such exceptions. (*Fermino, supra*, 7 Cal.4th at p. 720.) Although it is not included in that list, "false imprisonment committed by an employer against an employee is always outside the scope of the compensation bargain." (*Id.* at p. 723.) A reasonable detention of an employee to investigate a suspected theft would be a normal part of the employment relationship, but a reasonable detention would not be false imprisonment. (*Id.* at p. 717.) The court stated:

> "We have held … that normal employer actions causing injury would not fall outside the scope of the exclusivity rule merely by attributing to the employer a sinister intention. [Citation.] Conversely, … actions by employers that have no proper place in the employment relationship may not be made into a 'normal' part of the employment relationship merely by means of artful terminology. Indeed, virtually any action by an employer can be characterized as a 'normal part of employment' if raised to the proper level of abstraction.… [For instance], the harassment in *Hart* … may be viewed as a 'personal conflict' between an employee and a supervisor, … a not uncommon feature of an employment relationship.
>
> "What matters, then, is not the label that might be affixed to the employer conduct, but whether the conduct itself, concretely, is of the kind that is within the compensation bargain. In this case, Fermino does not contend … that seemingly ordinary employer disciplinary actions become tortious when seen in light of the employer's malicious state of mind. Rather, Fermino here claims that the acts themselves were prima facie outside the employer's 'proper role,' irrespective of [the employer's] intent to harm, because they criminally deprived her of her liberty and therefore were beyond the scope of the compensation bargain." (*Fermino, supra*, 7 Cal.4th at pp. 717-718.)

23.

### C.  *The jury was correctly instructed*

With this legal background in mind, we conclude the trial court here erred in granting the new trial motion.  The court was mistaken in its view that the complaint conceded the case was within the scope of the Workers' Compensation Act and the only issue was whether one of the exceptions in Labor Code sections 3601 and 3602 applied as well.  The court's conclusion on this point was based on the fact that the complaint stated Lee was at the workplace doing her job when she was injured and also stated the assault exception applied.  As we have said, an injury does not necessarily fall within the conditions of compensation delineated in Labor Code section 3600 just because it happened when the employee was in the workplace during working hours doing his or her job.  There must also be industrial causation, i.e., it must be shown that the work was a contributing cause of the injury.  The complaint did not concede that it was.  Further, the fact that the complaint pleaded the assault exception did not imply that the injury was within the scope of the Workers' Compensation Act and the recovery sought was based solely on that exception.  The pleading of one theory of recovery does not exclude another theory, even if the two are inconsistent.  (*Mendoza v. Rast Produce Co., Inc.* (2006) 140 Cal.App.4th 1395, 1403.)  The allegations in the complaint were sufficient to present both a theory that the facts fell outside the conditions of compensation and a theory that they fell within the assault exception.

The trial court's opinion that the complaint made a concession regarding the conditions of compensation was the basis of its ruling that the CACI No. 2800 instruction should not have been given.  The court thought that, in light of the complaint, the jury could only find that Lee was performing a task for her work when she was injured.  The instruction was correctly given, however, because the evidence was able to support a finding that the work was not a contributing cause of the injury.

The jury could properly make this finding by applying special instruction No. five, the instruction stating that an employer's conduct falls outside the workers' compensation

24.

scheme when an employer steps outside of its proper role or engages in conduct unrelated to the employment. This instruction stated the doctrine of *Fermino* correctly. If the jury found that carrying out the mock robbery was not within the employer's proper role, it could also find that unwittingly participating in the mock robbery as a victim was not part of the employee's work. Lee's counsel urged the jury to make this finding. Evidently, judging by the jury's question, this is in fact what it found.

It might be supposed that the jury could only apply the *Fermino* doctrine—concluding the exclusivity rule did not apply because the mock robbery was outside the employer's proper role—if it first found the injury was the sort of injury encompassed within the workers' compensation scheme and then treated the *Fermino* instruction as an exception. In other words, it might be supposed that the jury could properly reach the *Fermino* question only if it first found Lee was doing a task related to her work when injured. On this basis, it could be argued that the new trial motion was properly granted because the jury apparently reasoned improperly by using the *Fermino* doctrine as grounds for finding that the conditions of compensation were not met in the first place.[2]

*Fermino* itself fails to support these suppositions, however. We find nothing in the Supreme Court's opinion in that case to suggest the analytic path just described is the only way to arrive at the conclusion that an injury falls outside the compensation bargain because it was caused by employer action outside the employer's proper role. The jury could properly find the injury did not arise out of the employee's work because it was caused by such employer action and therefore the conditions of compensation did not exist. To hold that the jury must first find the injury to be within the conditions of compensation and then find it also to be within the *Fermino* exception, instead of simply

---

[2]The trial court apparently saw a difficulty of this kind at one point. While discussing motions for directed verdicts made by defendants while the jury was deliberating, the court said special instruction No. 5, stating the *Fermino* doctrine, had nothing to do with whether the injury was related the Lee's work.

finding that the conditions of compensation were not met in the first place in light of *Fermino*, would be elevating form over substance.

For the above reasons, the grounds given by the trial court for granting the new trial motion were erroneous. Defendants argue in support of several alternative grounds for affirming the order, but, as we will explain, these lack merit.

### D.    *The court acted within its discretion in declining to apply judicial estoppel*

Defendants reiterate their claim that, because Lee stipulated in the workers' compensation proceedings that her injury arose from her employment, she should have been barred by judicial estoppel from asserting in this case that it did not. The trial court acted within its discretion, however, in its holding that defendants forfeited a defense of judicial estoppel by failing to raise it until after the jury returned its verdict. "[J]udicial estoppel *is an equitable doctrine*, and its application, even where all necessary elements are present, is discretionary." (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422 (*MW Erectors*).)

The doctrine, which under some circumstances provides a party with a defense where an opponent asserts a position inconsistent with a position he or she asserted in a prior proceeding, serves to guard the integrity of the judicial system and prevent the use of unfair strategies. (*MW Erectors, supra,* 36 Cal.4th at p. 422.) Our Supreme Court has held that the doctrine applies "'most appropriately'" when five elements are present: (1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake. (*Ibid.*) These are mostly questions of fact (see *Bell v. Wells Fargo Bank, N.A.* (1998) 62 Cal.App.4th 1382, 1388) requiring consideration of evidence (see *Cloud v. Northrup Grumman Corp.* (1998) 67 Cal.App.4th 995, 1020). The trial

26.

court acted well within its discretion in declining to go into them when first raised after the trial was over.

The conclusion that the court acted within its discretion in declining to take up the judicial estoppel defense is reinforced by the lack of a record sufficient to show that, if the court had taken it up, it would have been able to find the defense was established. (See *Haley v. Dow Lewis Motors, Inc.* (1999) 72 Cal.App.4th 497, 510 [finding of judicial estoppel must be supported by substantial evidence].) In particular, there is nothing to support the fifth element—that Lee's first position was not taken as a result of ignorance, fraud, or mistake. Case law indicates that the point of this element is to ensure that the bar of judicial estoppel operates only to prevent bad faith or intentional wrongdoing resulting in a miscarriage of justice. (*Id.* at pp. 509-511.)

Employers routinely encourage injured employees to file workers' compensation claims as soon as possible after an injury, and as Lee points out, there is evidence in the record that this happened in this case. In her deposition, Lee testified that Traffenstedt came to her house after the incident with workers' compensation paperwork. He said if she filled it out, he would turn it in for her. She filled it out and gave it to him. A workers' compensation representative subsequently called her and set up an appointment with a doctor. Traffenstedt confirmed in his deposition that he brought the paperwork to Lee and urged her to seek medical treatment through workers' compensation. Under these circumstances, the facts that Lee submitted paperwork and that it included a boilerplate stipulation that her injury arose out of and in the course of her employment hardly show she intended to deceive the court, take unfair advantage of her opponents, or otherwise engage in intentional wrongdoing when she later determined that a civil remedy might be available.[3] This is particularly clear in light of the rather abstruse

_____

[3]We do not mean to suggest the paperwork Lee filled out for Traffenstedt was the same paperwork defense counsel relied on to show Lee stipulated that her injury arose from her employment. The latter was submitted on Lee's behalf later by a workers'

27.

nature of the workers' compensation exclusivity doctrine in general, and the arising-out-of condition in particular, as illustrated by our discussion of them above. There is no basis in the record for a finding that Lee "engaged in a deliberate scheme to mislead and gain unfair advantage, as opposed to having made a mistake born of misunderstanding, ignorance of legal procedures, lack of adequate legal advice, or some other innocent cause .…" (*Cloud v. Northrup Grumman Corp., supra,* 67 Cal.App.4th at p. 1020.)

Defendants maintain they did not raise judicial estoppel earlier because they had no way of knowing Lee would claim her injury did not arise out of her work. Defendants say nothing, however, to rebut the trial court's statement that Lee made this argument in opposition to defendants' motion for summary judgment, and defendants did not seek leave to amend their answer or otherwise try to raise judicial estoppel at that time. It is also worth noting that, although the jury instructions and the verdict form allowed the jury to find the injury did not arise out of the work, and Lee's counsel urged the jury to make that finding in closing argument, defendants still did not attempt to raise judicial estoppel until after the jury returned its verdict. Defendants' claim they did not forfeit the defense of judicial estoppel because they raised it as soon as they could is meritless.

Defendants also argue that the court erred by giving the jury special instruction No. 5. The instruction allowed the jury to find the mock robbery to be outside the employer's proper role, and on that basis to find the injury did not arise out of Lee's employment. Defendants' argument is based, once again, on the view that Lee could not claim the injury did not arise from her employment because she stipulated that it did when applying for workers' compensation benefits. We have already rejected that view.

compensation attorney. The point is only that the employer urged Lee to pursue a workers' compensation remedy and she did so. This is no indication of a deceptive intent.

28.

**E.      The prior workers' compensation award does not by itself show the conditions of compensation were met**

Throughout its briefing on the topic of the effect of Lee's prior workers' compensation claim, defendants express the notion that the mere fact Lee applied for and received benefits should resolve the issue of whether conditions of compensation were met and thus whether the injury fell within the compensation bargain.  They say, for instance:  "The issue [is] not whether workers' compensation applied to this case (which CACI 2800 focused on); clearly, it did because [Lee] filed a claim and recovered workers' compensation benefits."  Another example is the argument that Lee's counsel made "a knowingly false argument" and "intentionally misled the jury" because he urged the jury to find the injury not to have arisen out of Lee's work, even though Lee had previously applied for and obtained workers' compensation benefits.

These contentions overlook the obvious possibility that it was the workers' compensation award, not the jury's finding (or counsel's argument) that the injury fell outside the compensation bargain, that was in error.  The fact that the award happened first does not, by itself, control the result.  Some legal theory, such as defendants' judicial estoppel theory or the trial court's theory about Lee's pleading, would have to be established.  But those theories fail, for the reasons discussed above.  And we have explained how, in light of the evidence and the doctrine of *Fermino* as expressed in special instruction No. 5, the jury could properly find as it did.

**F.      Double recovery issue not properly before this court**

Finally, defendants' arguments appear at some points in their briefing to be animated by a sense that the verdict was improper, and the new trial order correct, because it would be unjust for Lee to receive both a workers' compensation award and a tort damages award.  In her reply brief, Lee says she is not attempting to obtain a double recovery and suggests it will be open to the compensation insurance carrier to apply for a lien against any judgment ultimately entered in Lee's favor.  Nothing in this opinion

29.

should be construed to mean Lee is entitled to a double recovery. The issue of whether and how to avoid such a recovery has not been fully briefed in this court and has not been decided in the trial court. It cannot be addressed in the first instance on appeal and we express no view.

## II.     *Motion for judgment notwithstanding the verdict*

Defendants maintain the trial court erred when it denied their motion for judgment notwithstanding the verdict. A motion for judgment notwithstanding the verdict should be granted "whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made." (Code Civ. Proc., § 629.) To the extent the ruling was based on the sufficiency of the evidence, we review it on appeal under the substantial evidence standard; i.e., we ask whether the jury's verdict was supported by substantial evidence. (*Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 703.) To the extent the ruling is based on issues of law, we review it de novo. (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284.)

Defendants first argue that judicial estoppel should have been applied to bar Lee from claiming her injury did not arise out of her employment. This would have established the only element of the workers' compensation exclusivity defense the jury rejected, and therefore defendants are entitled to judgment in their favor.

Setting aside the question of whether the evidence would still have supported application of the assault exception (which we will address below), this contention is without merit for the reasons we have already stated. The trial court reasonably exercised its discretion not to apply judicial estoppel.

Next, defendants argue that various parts of the verdict established all the elements of CACI No. 2810 and, therefore, the workers' compensation exclusivity defense was established as to the individual defendants, and judgment should have been entered in their favor.

30.

CACI No. 2810, which the trial court gave to the jury, is intended for use when a coemployee defendant asserts the exclusivity rule as a defense. It has three elements: (1) the plaintiff and the coemployee were employees of the employer; (2) the employer had a workers' compensation insurance policy covering the plaintiff at the time of injury; and (3) the coemployee was acting in the scope of his or her employment at the time of injury. The court did not include questions relevant to this instruction in the verdict form, however.

The jury found Lee was an employee of the district and the district had workers' compensation insurance in response to questions 1 and 2 in the verdict form for the first phase of trial. In response to question 10 in the second phase, the jury found the individual defendants were acting within the scope of their employment, and thus, by implication, were employees, at the time of the mock robbery. (Presumably, that question was asked in the second phase in order to determine whether there was respondeat superior liability.)

These findings do not compel the conclusion that the exclusivity rule mandated judgment in favor of the individual defendants because they do not include a finding that Lee's injury arose out of her employment. Labor Code section 3601 affords coemployees the benefit of the exclusivity rule only "[w]here the conditions of compensation set forth in Section 3600 concur ...." (Lab. Code, § 3601, subd. (a).) Those conditions, as has been mentioned, include the requirement of industrial causation. Following CACI No. 2800, the jury found this requirement was not met when it answered no to question 3 of the verdict form in phase one.

It follows that if the verdict form had included questions based on CACI No. 2810, the form would also have had to instruct the jury to skip those questions. The jury found the conditions of compensation did not concur, so question of the applicability of the exclusivity rule to the individual defendants did not arise. Lee makes these points in her

31.

brief as respondent to the cross-appeal, but defendants do not respond to them in their reply brief.

Defendants do argue that CACI No. 2800 should not have been given in the first place because Lee could not dispute industrial causation, but we have already rejected this argument.

Finally, defendants argue there was no evidence of the individual defendants' intent to harm Lee, so there was insufficient evidence to support the assault exception. We need not discuss this, since the verdict was based on the finding that the Labor Code section 3600 conditions of compensation did not concur (since Lee's injury did not arise out of her work), not the assault exception. Further, the issue is forfeited because it was not included in the motion and thus is being raised for the first time on appeal as a ground for judgment notwithstanding the verdict. (See *Simplon Ballpark, LLC v. Scull* (2015) 235 Cal.App.4th 660, 667-669 [order granting motion for judgment notwithstanding the verdict could not be reversed on appeal based on improper service because that issue was not properly raised in trial court].)

## III. *Additional arguments*

### A. *Verdict not appealable*

Defendants' brief contains a separate section stating reasons why "the verdict" should be "overturned." Defendants' notice of cross-appeal purports to give notice of an appeal from the verdict, among other things. A verdict upon which judgment has not been entered is not appealable, however. (*Robins v. Weis* (1950) 97 Cal.App.2d 144, 145.) Defendants' cross-appeal therefore is only from the order denying their motion for judgment notwithstanding the verdict; it is not from the verdict itself. We will interpret the arguments in this section as additional arguments for affirming the order for a new trial or reversing the order denying judgment notwithstanding the verdict.

32.

**B. Repetitious arguments**

Two of these arguments are only repetitions of arguments we have already discussed: the CACI No. 2800 instruction should not have been given because the jury should not have been allowed to find that Lee's injury did not arise out of her work, and Lee's counsel should not have been allowed to say in closing argument that Lee's injury did not arise out of her work. We need not address these again.

**C. Arguments not raised in motions**

The remaining two arguments were not raised in the motion for a new trial or the motion for judgment notwithstanding the verdict (though they were raised during trial). It is improper to raise them for the first time on appeal as bases for upholding or challenging the trial court's rulings on those motions. (Code Civ. Proc., § 657 [order granting new trial to be affirmed on appeal if it should have been granted on ground stated in motion]; *Simplon Ballpark, LLC v. Scull, supra,* 235 Cal.App.4th at pp. 667-669 [order on motion for judgment notwithstanding the verdict not reversible on basis not presented in trial court].) They also fail on their merits, as we will explain.

### 1. The collateral source rule and the exclusion of evidence of the prior workers' compensation award

First, the trial court excluded evidence of Lee's application for and receipt of workers' compensation benefits. The court also gave the jury the following instruction, which was based on the first sentence of CACI No. 3963: "[Y]ou are not to consider whether or not the plaintiff, Kathy Lee, received workers' compensation benefits as a result of the incident which is the subject matter of this lawsuit in determining the issues in this case." Defendants argue that the documents showing Lee's application for and award of compensation should have been admitted into evidence to show that her injury arose out of her employment.

Lee's counsel first raised the issue in a motion in limine, saying evidence of workers' compensation payments should be excluded. Lee relied on the collateral source

33.

rule, i.e., the rule that a payment from a third party for a loss to a plaintiff is not admissible to show that a tort action for the same loss is precluded or that the amount of damages should be reduced. In response, defendants argued, "We have got to prove that the plaintiff received workers' compensation benefits in order to establish that workers' comp is an exclusive remedy, and we should receive a defense verdict because of that." The trial court ruled that "the fact that she is covered by [a] workers compensation policy" was admissible but not "the amounts that she has received …." "[I]n the event of a plaintiff's verdict," the court continued, "I will do the deduction." Defense counsel had asserted earlier that if there was a plaintiff's verdict, the district would be entitled to offset the amount of the workers' compensation benefits "since it's the same entity," presumably meaning the district was self-insured.

The issue arose again during opening statements. Defense counsel told the jury, "The evidence will show that Kathy Lee did, in fact, process a workers' compensation claim. We will not discuss the amount that she received. We will not discuss that. But the evidence will show that she did, in fact, receive workers' compensation benefits and that her medical expenses were paid for." Lee's counsel objected and the court and parties conferred outside the presence of the jury. Defense counsel said he believed the in limine ruling only barred mention of the amount of the benefits Lee received. He said, "And for these jurors to understand the case, they need to know that she got workers' compensation." The court explained that it had intended to rule that the fact that the district had a workers' compensation policy was admissible (since that is one of the conditions of compensation required to be shown by Lab. Code, § 3600) but not the facts that Lee had applied for and received benefits. The issue came up a third time during a discussion of jury instructions, leading to the instruction that the jury could not consider whether or not Lee received workers' compensation benefits.

Defendants now argue that the collateral source rule does not apply to the compensation benefits paid in this case. They further argue that the error of excluding

the evidence on this ground prejudiced them because the evidence would have "disproved" Lee's assertion that her injury was not caused by her work.

It is unclear whether the collateral source rule applies in this situation. Ordinarily, the rule applies only to sources of compensation "wholly independent" of the defendant. (*Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6.) In general, the plaintiff's insurer is a wholly independent source while a cotortfeasor or a cotortfeasor's insurer, or the tortfeasor's own insurer, is not. (*Id.* at pp. 9-10; *Pacific Gas & Electric Co. v. Superior Court* (1994) 28 Cal.App.4th 174, 178, 180.) Here the collateral source was workers' compensation benefits paid by the district's policy. Under the general principles just described, this would not be an independent source; the defendant is the policyholder, so the collateral source rule would not apply. Yet the California Supreme Court held that the rule did apply in a case in which an employee received benefits from the employer's workers' compensation policy and then sued a third-party tortfeasor, the compensation insurer having waived its right of subrogation against the third party. (*De Cruz v. Reid* (1968) 69 Cal.2d 217, 223-227.) A commentator explained this result by pointing out that workers' compensation insurance is a benefit of employment; thus the employee can be deemed to have paid for the insurance with his labor, so the situation is similar to that in which the collateral source is the plaintiff's own insurance and therefore the rule applies. (Note, *California's Collateral Source Rule and Plaintiff's Receipt of Uninsured Motorist Benefits* (1986) 37 Hastings L.J. 667, 674-675.) In *Lund v. San Joaquin Valley R.R.* (2003) 31 Cal.4th 1, the California Supreme Court appeared to assume the collateral source rule generally applies to workers' compensation benefits. (*Id.* at pp. 10-11 [stating that, as general rule, when employee sues employer under Federal Employers' Liability Act, jury should not be told of employee's *in*eligibility for workers' compensation benefits, just as juries ordinarily should not be told of plaintiff's collateral sources of compensation for injury caused by defendant].)

35.

In our view, it was probably correct in this case to apply the collateral source rule to exclude evidence of the benefits received by Lee. As a rule of evidence, the collateral source rule serves to avoid the danger that the jury will decline to impose liability or will reduce damages in the belief that the plaintiff has already been compensated and should not receive a double recovery. In this case, the possibility of a double recovery actually happening appears to be remote, so the rule is especially apposite. The trial court and the parties all appear to agree that if Lee obtains a damages judgment, some means will be employed to ensure the compensation benefits will be offset or refunded. Informing the jury of Lee's prior receipt of benefits therefore could only have been misleading, giving rise to the risk the rule is meant to avoid. The rule apparently served its purpose here.

In the end, however, we need not decide whether the collateral source rule was applicable here to exclude the documents from Lee's workers' compensation file. Even if the ruling was erroneous, defendants have not shown it was prejudicial. Contrary to defendants' position, the fact that Lee received benefits could not prove the workers' compensation exclusivity rule applied, for the mere fact that an award was made cannot show that an award was the correct remedy. The elements stated in Labor Code sections 3600, 3601, and 3602 determine whether the exclusivity rule applies and the existence or nonexistence of an award is not one of those elements. The stipulation in the documents that the injury arose out of the employment is relevant to defendants' judicial estoppel argument, but that argument fails for the reasons we have given. The stipulation may also be an indication that Lee or her workers' compensation counsel at one time *believed* the injury arose out of her employment, but what she believed was not the issue. The question was whether, in light of the law as stated in special instruction No. 5, it was indeed the fact that the injury arose out of the employment. That Lee and her workers' compensation attorney signed a form containing a boilerplate recitation on the point did not reveal the answer to this question.

### 2. *Chief Whiting's testimony*

Finally, defendants contend the trial court should have excluded Chief Whiting's opinion testimony about the dangers arising from the mock robbery. Defendants' first argument in support of this contention is based on Code of Civil Procedure section 2034.210. That section provides that if an expert is a party or an employee of a party, or has been retained by a party, then the designation of the expert as a witness must be accompanied by an expert declaration. (Code Civ. Proc., § 2034.210, subd. (b).) Lee did not submit an expert declaration by Whiting. Whiting was not, however, a party, an employee of a party, or a retained expert. As defendants acknowledge, Lee's expert witness list designated him as a nonretained expert. Code of Civil Procedure section 2034.210, subdivision (b), consequently, does not apply. Defendants do not even attempt to explain how it could apply.

Next, defendants argue that Whiting's opinions about the risks of a mock robbery were irrelevant because the only question for the jury was whether defendants intended to harm Lee. As we have explained at length, this was not the only question for the jury. Another question was whether, by conducting the mock robbery, the district stepped outside its proper role as an employer—the question posed by special instruction No. 5—which in turn was relevant to the question of whether Lee's injury arose out of her employment. Whiting's opinions about the risks of conducting a mock robbery were relevant to these issues.

Last, defendants aver that Whiting's expert testimony was not "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to [him] or made known to him at or before the hearing," as required by Evidence Code section 801, subdivision (b). According to defendants, Whiting's background did not qualify him to paint a scenario in which people might have heart attacks, trip over furniture, or get shot by an armed bystander.

37.

Whiting was a chief of police, had been an officer with the Taft Police Department for 29 years, and had spent his entire career in law enforcement. The trial court did not abuse its discretion in determining that his experience and training were sufficient to support his testimony about the types of dangers likely to arise in the disorder accompanying an armed robbery of a business establishment. An important question for the jury in this case was whether the mock robbery was merely a training exercise that did not go well, as defense counsel described it his closing argument, or was instead so dangerous that it stepped outside the employer's proper role. Whiting's opinion about the dangerousness of a robbery scene was properly admitted to support Lee's position on this question.

## *DISPOSITION*

The order granting a new trial is reversed. The order denying the motion for judgment notwithstanding the verdict is affirmed. The case is remanded to the trial court for further proceedings consistent with this opinion. Plaintiff Lee is awarded costs on appeal.

_____

Smith, J.

WE CONCUR:


_____

Hill, P.J.


_____

Franson J.

38.

Filed 11/15/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KATHY LEE,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>WEST KERN WATER DISTRICT et al.,<br><br>     Defendants and Appellants. | F070772<br><br>(Super. Ct. No. S-1500-CV-277481)<br><br>**ORDER ON REQUEST FOR PUBLICATION** |

The request for publication of the opinion filed in the above-entitled action on November 8, 2016, is granted.  The nonpublished opinion meets the standards for publication specified in California Rules of Court, rule 8.1105, and it is ordered that the opinion be certified for publication, in its entirety, in the official reports.

                                                                                                            Smith, J.

WE CONCUR:


 Hill, P.J.


 Franson, J.