Filed 8/21/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| YOLANDA FRAUSTO et al.,<br><br>    Plaintiffs and Respondents,<br>v.<br>DEPARTMENT OF THE CALIFORNIA HIGHWAY PATROL et al.,<br><br>    Defendants and Appellants. | A156552<br><br>(Alameda County Super. Ct. Nos. RG16809897 & RG17857166) |

John Anthony Cornejo died of a methamphetamine overdose at Highland Hospital on March 30, 2015, after having been arrested by California Highway Patrol officers during a traffic stop and observed to put in his mouth and swallow something that he insisted was gum, not drugs. Cornejo declined repeated offers of medical attention and no symptoms of drug intoxication were observed until after he had been transferred to the custody of deputy sheriffs at the county jail.

This appeal is from a jury verdict in favor of Cornejo's parents in a suit for wrongful death predicated on the negligence of the officers who took Cornejo to jail rather than to the hospital, and from the trial court's order denying a motion for judgment notwithstanding the verdict. Defendants maintain the officers had no duty to obtain a medical examination for Cornejo in the circumstances presented; that they fulfilled the scope of any duty they may have had by taking him to a jail with medical staff on site; and that their

1

failure to take him to the hospital was not a proximate cause of his death. They further contend the trial court erred in ruling the jury could not consider Cornejo's intentional act of swallowing the methamphetamine in allocating comparative fault and in denying defendants' motion in limine to exclude evidence and argument that the officers attempted to coerce an admission to possession of a controlled substance by conditioning medical treatment on Cornejo's admitting he swallowed a controlled substance. We affirm.

## PROCEDURAL BACKGROUND

Plaintiffs Yolanda Frausto and Norman Cornejo, parents of John Anthony Cornejo, sued defendants, the California Highway Patrol (CHP) and individual CHP officers in state court for negligence, wrongful death, survival action and violation of the Tom Bane Civil Rights Act (Bane Act) (Civ. Code, § 52.1 [interference with legal rights by threat, intimidation or coercion]). The case was removed to federal court after the complaint was amended to include a cause of action for violation of civil rights under title 42, United States Code section 1983. The federal court apparently granted the CHP defendants' motion for summary judgment on the federal claim and declined to exercise jurisdiction over the state claims.[1]

Plaintiffs returned to state court with a complaint against the CHP and four of its officers, Michael Diehl, Zachary Trezeniewski, Cosimo Bruno and David Hazelwood, Jr. The case ultimately went to trial on the negligence claim in the fourth amended complaint, after the trial court sustained without leave to amend a demurrer to the Bane Act cause of action and

---

[1] Defendants' brief represents that the federal court found plaintiffs failed to raise a genuine issue of material fact as to whether the officers violated their constitutional rights and whether the officers were entitled to qualified immunity.

2

granted defendants' motion for judgment on the pleadings as to the survival action. Plaintiffs dismissed their claims against Trezeniewski during trial. The jury returned a special verdict against defendants in the amount of $827,544.00, allocating comparative fault 35 percent to Diehl, 13 percent to Bruno, 30 percent to Hazelwood, and 22 percent to Cornejo. After judgment was entered, defendants unsuccessfully moved for judgment notwithstanding the verdict. This appeal followed.

## FACTUAL BACKGROUND

About 4:00 a.m. on March 29, 2015, CHP Officers Diehl and Trezeniewski stopped a car for driving with fog lights but no headlights illuminated, in violation of Vehicle Code section 24250. Diehl approached the passenger side while Trezeniewski approached the driver, who identified himself as "Norman" Cornejo. There were three passengers in the car. Checking the name and birthdate given by the driver, the officers learned he was unlicensed. Trezeniewski called for backup due to the number of people in the car. Hazelwood and Bruno were among the officers who responded to the scene. It was Bruno's third day on the job and Hazelwood was his field training officer, his first time acting in this role.

Diehl approached the driver's side and asked Cornejo to get out of the car. As Cornejo opened the car door, Diehl saw he was not wearing a left shoe and detected the odor of alcohol coming from the car. Diehl conducted a patdown search at the back of Cornejo's car, after which Cornejo moved his right hand in front of his mouth. Diehl asked Cornejo if the reason his shoe was off was that he had "put dope in his shoe." Cornejo said no and kicked his shoe toward Diehl. As he walked with Cornejo to the front passenger side of the vehicle to begin field sobriety tests, Diehl asked if Cornejo had anything in his mouth and when Cornejo started to answer, Diehl observed a

3

"chewing motion." Cornejo said it was gum. Diehl asked Cornejo to spit out whatever was in his mouth; he denied telling Cornejo to "spit the bag out." Cornejo became very nervous, backing away from Diehl while raising his arms in front of his face and "swatting" at Diehl, then turning and starting to run. According to Diehl, Cornejo had had his back to Officers Hazelwood and Bruno, who were about 20 feet away. Diehl and other officers grabbed Cornejo and brought him to the ground as Cornejo pulled his arms and hands away and yelled that he only had gum. The officers took Cornejo into custody.

Cornejo said he had decided to swallow his gum. Diehl searched the area in case Cornejo had discarded something but did not find anything. He asked if Cornejo had swallowed any drugs, and Cornejo said it was only gum. Diehl explained to Cornejo that if he "made a mistake and swallowed drugs," Diehl "would need to call for medical staff to ensure his health would not be affected." A search of Cornejo's vehicle revealed a methamphetamine pipe and Brillo pad, which Diehl testified is commonly used by crack cocaine users.

Diehl acknowledged that during training, he was told he was required to obtain medical treatment for an arrestee if he thought it was necessary; that if he thought Cornejo had swallowed drugs, he would have an obligation to call for medical staff; that it was common for people he arrested to lie to him; and that he told the other officers on the scene he believed Cornejo had swallowed a controlled substance. Diehl's report stated, " 'Based upon my training and experience the substance in which Cornejo had swallowed was suspected to be a controlled substance.' "

Diehl testified that the California Highway Patrol Officer Safety Manual (CHP Manual) requires taking a person to the hospital, or calling an

4

ambulance, when the person is in need of medical attention, even if the person is not exhibiting physical symptoms. He testified that not all drugs "require a medical call" and he would determine which required medical attention based on "signs and symptoms of potential overdose." During the approximately one hour he was at the scene, Diehl never saw Cornejo exhibit signs of being under the influence of a stimulant. Cornejo did not appear to be in need of medical attention: He had no outward signs of illness or medical distress and he said there was nothing wrong with him.

Asked, "the only way you were going to take [Cornejo] to the hospital was if he admitted that he had an illegal drug in his possession, right," Diehl replied, "[d]epending on what it was that he said he swallowed, yes." Diehl denied his intention in asking Cornejo what he swallowed was to get Cornejo to incriminate himself, and testified that he did not intend to use Cornejo's statement to support a criminal charge. Diehl testified that once a person had ingested drugs, the ingested substance would not support a criminal charge; the concern at that point would be to make sure the person was not harmed. If Cornejo had admitted ingesting methamphetamine, Diehl would not have recommended that the district attorney charge Cornejo; his main focus would have been to get Cornejo to the hospital.

Trezeniewski, who was primarily focused on the three remaining occupants in the car, did not see Cornejo put anything in his mouth or see him with a plastic baggie. While Diehl and Cornejo were on the ground, Trezeniewski heard Diehl shout "[s]pit it out" or "[g]et it out of your mouth" but did not hear him say "[s]pit out the bag." Trezeniewski agreed that if he saw an arrestee put in his or her mouth a plastic baggie he presumed contained a controlled substance, the person would need medical attention. He would not take someone to the hospital for "any" controlled substance,

5

however, and he would rely on the person to be honest about what he or she had taken.

Hazelwood testified that he heard Diehl ask, "[w]hat did you put in your mouth" and Cornejo say, "[i]t's gum," and saw Diehl reach toward Cornejo and Cornejo "swipe" his hand toward Diehl's hand and back away. After Cornejo had been handcuffed, he talked about his shoulder being injured from a prior injury. Hazelwood asked Cornejo what he had put in his mouth and Cornejo said it was gum. Hazelwood told him, "If it's anything other than that, you need to tell us because you could die from it. It's dangerous." Cornejo repeated, "It's gum." Hazelwood did not hear anyone yell, "[s]pit out the bag," during Cornejo's arrest. He did not remember whether he heard Diehl say he believed Cornejo had swallowed a controlled substance. At the time Hazelwood put Cornejo in his patrol car, he believed Cornejo had swallowed gum. He acknowledged that he had had arrestees lie to him "occasionally."

Bruno testified that Cornejo "swatted his hand across his face and his mouth" and was chewing; Diehl told him to spit out what he had, and Cornejo said it was gum, then tried to flee. After being handcuffed, Cornejo said his arm hurt from a previous injury and declined an offer of medical attention. Bruno asked Cornejo if he had swallowed something and Cornejo said it was gum, which Bruno believed because Cornejo seemed sincere and "at that stage of my career, I didn't think that anyone was really going to lie about something." After the attempt to flee, Cornejo was "calm and respectful." Bruno did not see a plastic baggie in Cornejo's mouth or in his hand, Hazelwood did not tell Bruno he saw a plastic baggie in Cornejo's mouth, and Diehl did not tell Bruno he believed Cornejo had swallowed a controlled

6

substance.  Bruno searched Cornejo and found nothing on him, and Bruno did not see any gum wrappers or packets in the vicinity of the arrest.

Sergeant John Koven received a call to respond to the arrest scene due to a possible use of force and possibility the arrestee had put an unknown substance into his mouth.  He arrived at the scene after Cornejo had been handcuffed and was lying on the sidewalk, complaining about being in pain.  Cornejo said his collarbone was hurting from a previous injury and declined Koven's offer of medical attention.  Diehl told Koven he saw Cornejo put his hand in front of his mouth, then noticed him chewing and several times asked what Cornejo had put in his mouth and whether it was drugs, and that Cornejo said it was gum.  Koven told Cornejo, "if it's gum, we don't have a problem, but if it's any type of illegal drugs or contraband, we need to get some medical attention because there could be some problems, depending on the amount, if you did swallow that."  Cornejo was cooperative and polite, answered all Koven's questions and stated definitively and without equivocation that what he swallowed was gum, not drugs.  Koven told Hazelwood to let the jail staff know Cornejo had put something in his mouth, the CHP officers could not confirm what it was but Cornejo said it was gum.

Koven testified that Diehl did not tell him he believed Cornejo had swallowed a controlled substance and neither Bruno nor Hazelwood reported having seen Cornejo place what appeared to be a plastic baggie in his mouth.  If they had, CHP policy would have required a medical examination.  Asked if he would agree that "an arrestee should not be required to incriminate himself in order to obtain medical treatment," Koven replied, "everyone is free from self-incrimination."

Hazelwood and Bruno left the scene to take Cornejo to the Santa Rita Jail in Dublin, about half an hour away.  Cornejo asked if he could be taken

instead to the Glenn E. Dyer Detention Facility, two or three minutes away, because it would be too hard for him to get home from Dublin in the morning, and Hazelwood agreed. At the gate where the Alameda County sheriffs receive arrestees, there was a conversation about Cornejo's medical conditions, but Hazelwood did not remember whether the jail nurse was there or just a deputy sheriff. Cornejo was asked a series of questions such as whether he had consumed drugs or alcohol, had diabetes or epilepsy. Hazelwood informed the deputy Cornejo had swallowed something, saying "[w]e didn't know what it was, but he had told us it was gum." He heard Cornejo tell the deputy, "I swallowed gum." Neither Hazelwood nor Bruno told the deputy Cornejo might have swallowed a plastic baggie they believed contained a controlled substance.

Hazelwood and Bruno arrived back at the office around 6:00 a.m. Bruno drafted the documents related to the arrest and Hazelwood, as field training officer, reviewed them. Normally one of the officers who made the enforcement stop would be the "arresting officer" responsible for the paperwork but Diehl had suggested Bruno be the arresting officer as a "training opportunity," and Hazelwood agreed.

One of the documents Bruno drafted was the declaration of probable cause, the document supporting probable cause for an arrest, which is signed under penalty of perjury. The probable cause declaration included the following: "Officer Hazelwood and I observed Cornejo swat his right hand at his mouth and appeared to place what looked like a plastic baggie in his mouth. . . . Officer Diehl instructed Cornejo to spit out the bag, however, he refused, claiming it was only gum. Officer Diehl once more commanded Cornejo to spit the 'gum' onto the ground and again he refused." The arrest report Bruno drafted did not mention a bag or baggie: Bruno wrote that he

8

observed Cornejo "swat his right hand at his mouth" and then "chew on the object very rapidly," and that Diehl instructed Cornejo to " 'spit out the item in his mouth' " but Cornejo "refused, claiming that 'it was only gum.' "

Bruno testified that the statements in the probable cause declaration about a plastic baggie were mistakes, and that there were several other mistakes in the declaration as well.[2]  He could not explain why he used the term "plastic baggie" in the probable cause declaration.  He testified that he did not see a plastic baggie at the scene and he did not hear Diehl tell Cornejo to "[s]pit out the bag," just to "spit it out."  The reference to a plastic baggie in the probable cause declaration was first called to his attention at his deposition in the present case; he was surprised, and said it was a mistake. Bruno agreed that if Cornejo had put a plastic baggie in his mouth, he should have received medical treatment.

Bruno testified that the probable cause declaration was submitted after he drafted and signed it, he did not see it again and he could not have made changes to it unless it was sent back to him.  The arrest report remained on the computer system and could be revised.  Bruno learned Cornejo had died when he came to work on April 3, after which he added this information to the arrest report.  He denied having conversations with anyone at CHP about deleting references to a plastic baggie from the arrest report.

Questioned at trial about the probable cause declaration, Diehl testified that he had not seen it before and the reference to a bag was a mistake; he did not tell Cornejo to spit out a bag, did not see a plastic baggie in Cornejo's hand or mouth, and did not tell Bruno he saw a plastic baggie in Cornejo's

---

[2] Other mistakes he described were stating Cornejo's first name as "Robert" when the name he had been given was "Norman" and indicating the date as March 22, 2015, rather than March 29, 2015.

9

mouth. Diehl acknowledged that at his deposition, when asked if he recalled "a plastic baggie being in Cornejo's hand," he replied, "Not in his hand. If I was giving descriptions, it is what I observed in his mouth." Diehl acknowledged at trial that he did not believe Cornejo's statement that he only swallowed gum.

Hazelwood testified that he "probably" reviewed the probable cause declaration and did not recall whether he made any corrections, as "[t]his is between Officer Bruno and the judge." As field training officer, Hazelwood reviewed Bruno's reports and occasionally suggested revisions for grammatical errors. He acknowledged that if he had seen the statement indicating he saw Cornejo put a plastic baggie in his mouth and in fact he had not seen Cornejo do this, he would have told Bruno so at the time and asked Bruno to correct the declaration of probable cause. Hazelwood testified, however, that he did not see this sentence when he reviewed the document; the reference to a plastic baggie was first brought to his attention at his deposition. He also did not see the sentence in Bruno's report saying "Officer Diehl instructed Cornejo to spit out the bag." Hazelwood testified that he did not see Cornejo put anything in his mouth, as Cornejo's back was to him, and he did not hear Diehl tell other officers he believed Cornejo had swallowed a controlled substance.

Deputy Sheriff Ivan Stewart, the intake officer on duty when Cornejo was brought to Glenn E. Dyer Detention Facility, about 5:30 a.m., testified that there was no nurse at the gate. The procedure was for the intake deputy to ask the arrestee a series of medical screening questions and summon a nurse if any were answered in the affirmative. Stewart remembered one of the CHP officers saying that Cornejo had said he swallowed gum, and during intake, Cornejo said the same thing. Cornejo responded "no" when asked if

10

he was taking prescription medication, was under the influence of drugs or alcohol, or had an addiction to drugs or alcohol.  Despite this response, Stewart marked "yes" on the form for "is the arrestee under the influence of drugs/alcohol," and circled "drugs."  He did so in an effort to be "extra cautious" and alert the nursing staff who would be conducting a full screening before Cornejo entered the general jail population, because the arrest report indicated Cornejo had been arrested for possession of drug paraphernalia, along with "everything I was told regarding the fact that he had swallowed gum."  The CHP officers did not tell Stewart that Cornejo swallowed a plastic baggie or that they believed he swallowed a controlled substance.  If they had, Stewart would have summoned a nurse.  Cornejo appeared calm and lucid, not showing any signs of medical distress.

Deputy Sheriff Kevin Beyrodt noticed Cornejo waiting for further processing and recognized him as having previously been through the facility.  Knowing Cornejo to "not be a problem," Beyrodt took him into a secondary cell to continue his screening.  The jail had two holding cells for single occupants in use at the time, with three-foot square windows in the steel doors that allow seeing "pretty much every corner" of the cell.  The cells have adjoining walls and one of the two cells is directly across from the nurse's station.

Cornejo told Beyrodt he had been charged with resisting arrest after the CHP officers thought he had swallowed something and Cornejo said it was gum.  Cornejo's demeanor was "lighthearted" and unconcerned, giving the impression he thought the officers had made a mistake.  Beyrodt told him the jail had medical staff if he needed assistance; he could be taken to a hospital to have his stomach pumped; and if he did not want to tell anyone

what he had ingested, there were toilets in the cell that no one monitored in which he could throw up or otherwise expel something from his body.

Beyrodt went to Cornejo's cell at least four times that morning, each time asking if he needed medical attention. Cornejo declined each offer, saying there was nothing to be concerned about. Beyrodt reminded Cornejo that he could expel anything himself and no one would know. Beyrodt testified that he had a good rapport with Cornejo; he did not believe Cornejo had swallowed a controlled substance but continued to raise the subject because "that's the last thing I want to have happen, so it's just something I'm going to mention."

Beyrodt and another deputy escorted Cornejo to have a booking photograph taken at 6:08 a.m. When Beyrodt came to get him, Cornejo's shoes were off and he was starting to sweat; Cornejo said he was hot. Beyrodt told Cornejo "you are acting different" and asked if anything was going on, and Cornejo said he had used cocaine prior to his arrest. Beyrodt again offered medical attention and Cornejo again declined.

When Cornejo went back to the cell after the booking photograph, he was still sweating and he was acting "slightly different . . . a little jovial," but communicating and lucid. After leaving the intake area, Beyrodt heard a radio broadcast of a "man down" in a holding cell and returned to see Cornejo on the floor, shaking, with foam in his mouth. Two or three deputies and the nurse were already there and an ambulance had been called. After Cornejo was taken by the paramedics, Beyrodt saw vomit in his cell and "bologna or something" but he was not sure if it was from Cornejo or "prior."

Medical examiner Paul Hermann performed the autopsy on Cornejo on April 1, and concluded he died of acute methamphetamine intoxication. Herrmann looked for evidence that Cornejo had swallowed baggies

containing drugs and found no plastic or other foreign material in his gastrointestinal tract.

CHP Lieutenant Eric Jones testified as the CHP's designated "person most knowledgeable" regarding issues in the present case, and the jury was instructed to regard his testimony as that of the CHP. He testified that section 100.69 of the CHP Manual states, "Officers shall arrange for a medical examination whenever a prisoner appears to be in need of or requests medical attention, regardless of outward symptoms of illness or injury." "Arrange for a medical examination" is not defined in the CHP Manual but examples would include calling an ambulance or taking someone to the hospital. Asked how someone would appear to be in need of medical attention without outward symptoms of illness or injury, Jones offered as an example that a person involved in a serious car accident should get medical attention even without obvious lacerations or broken bones. He testified that an officer should obtain medical treatment for someone displaying outward injury even if the person declines medical treatment. Asked if the policy would require officers to arrange for a medical examination if they observe suspected ingestion of drugs, Jones said that specific scenario was not covered in the policy and officers would be expected to use sound professional judgment to determine whether medical attention was needed. In some circumstances, taking an arrestee to a jail staffed with medical professionals could satisfy the requirement to arrange for a medical examination, depending on the procedures and staffing of the particular jail.

Dr. Edward Cetaruk, an emergency physician and medical toxicologist who practices in Colorado, testified as plaintiffs' expert in emergency medicine and toxicology. Of the 10 or 15 patients Dr. Cetaruk had personally treated who opportunistically ingested a controlled substance, none had died.

13

In one study he had reviewed, the Oregon Poison Center reported that of 55 patients who had opportunistically swallowed methamphetamine in an attempt to conceal it, the only fatality was a person who had a heart attack before arriving at the hospital.

Dr. Cetaruk opined that if Cornejo had been taken to the hospital after his arrest, he more than likely would have survived. He explained that the earlier a person in this situation is treated, the more opportunity there is to avoid or treat toxicity. Methamphetamine does not cause problems while still in the gastrointestinal tract; its effect occurs when it is absorbed. Methamphetamine increases heart rate and blood pressure, dilates the pupils and causes a cold, clammy sweat; with more toxicity, there can be a change in mental status such as confusion, delirium, seizures or coma, very high body temperature, nausea, vomiting, and respiratory failure. There is no antidote for amphetamines, so treatment consists of administering drugs to counteract their effects and supportive care for symptoms. If brought to the emergency room before cardiac arrest or another severe event, the person survives more often than not.

Assuming police officers saw Cornejo swallow a plastic baggie they believed contained a controlled substance and Cornejo said he only swallowed gum, if Cornejo had been taken to an emergency room, the typical practice would be observation for 6 to 24 hours. In Dr. Cetaruk's experience, some prisoners in this situation are "forthcoming" with their histories and others are not; many do not want treatment. An individual in custody who refused treatment would be kept for observation, with the police officer remaining present. If signs of toxicity occur and the prisoner consents, agents can be given to remove the suspected substance from the gastrointestinal tract and avoid further absorption. Patients who have not consented to treatment and

14

become clearly ill and unable to make appropriate decisions would be placed on a drug and alcohol hold and treated against their will. In Colorado, a doctor acting in good faith and providing treatment a "normal" person would consent to can impose an alcohol or drug hold unilaterally; Dr. Cetaruk did not know what the procedure would be for such a hold in California.

Dr. Cetaruk testified that the records indicated Cornejo was lucid when he was arrested and booked into jail; this would have been the appropriate time for observation based on suspicion but not for an alcohol or drug hold. Observation could be in a jail rather than a hospital if the jail had "a medical facility that was capable of properly observing" the prisoner.

Dr. Cetaruk testified that toxicology testing detected methamphetamine and amphetamine in Cornejo's blood drawn at 9:46 a.m. on March 29.[3] Amphetamine occurs as methamphetamine is metabolized, so the ratio of methamphetamine to amphetamine indicates how recently the methamphetamine was ingested. Cornejo's ratio, about 21:1, indicated ingestion in the preceding few hours. Dr. Cetaruk estimated Cornejo ingested "in the order of a few grams or a couple grams" based on the degree of his toxicity.

Plaintiffs' medical expert, emergency physician Dr. Gary Tamkin, also testified that the sooner medical treatment is received by a person who has ingested an unknown amount of a controlled substance, the higher the person's chances of survival. Within the first hour after ingestion, methods for removing the substance and preventing absorption—stomach pumping or treatment with charcoal—can be attempted, albeit not without risk; after a few hours, only supportive treatment is available, treating complications as they arise. By the time Cornejo started showing signs of toxicity, around 7:00

---

[3] No cocaine was found.

a.m., it was too late for decontamination by means of stomach pumping or charcoal absorption.

Dr. Tamkin testified that he is expected to speak privately with an arrestee who is brought to the emergency room, because an arrestee is entitled to the same medical privacy as other patients. In his experience with hundreds of arrestees brought to the emergency room, he had never personally had an arrestee who was refusing treatment admit swallowing a controlled substance after telling the officer otherwise. Asked what he would do if law enforcement brought an arrestee to the emergency room and said they saw him swallow a baggie of what they believed to be drugs and found a methamphetamine pipe in his car, Dr. Tamkin said he would speak to the arrestee in private and try to convince him to consent to treatment; absent consent, he would hold the arrestee for observation for 6 to 12 hours. Even if the arrestee denied ingestion, once he was discharged it would be with printed instructions indicating what signs and symptoms to watch for.

Tamkin testified that patients have a right to refuse medical treatment as long as they are able to understand their situation and make informed decisions about their care. In California, physicians can take over medical decision making if the patient is not able to assess the situation and make decisions, but the determination that the patient is incapable must be made by two physicians.

Dr. Tamkin testified that it was impossible to answer the question whether there was a point at which Cornejo could not have been saved: His chances of survival would have been better the sooner he was treated, but even at the point he was found having seizures, although his chances would have been significantly reduced, survival was not impossible. He had testified at his deposition that Cornejo more likely than not would have

16

survived if he had admitted to officers on the scene that he swallowed methamphetamine, was immediately taken to the hospital, and admitted the ingestion to hospital staff.

David Fairbrother, plaintiffs' expert on police policy and practices, opined that the officers exercised a "less than satisfactory level of care" by failing to correctly establish that Cornejo "was a victim of drug ingestion in combination possibly with alcohol" and needed medical care. He testified that the officers ignored the indications that Cornejo ingested drugs to avoid prosecution and failed to fully investigate his condition with basic field sobriety tests, and the supervisor called in because the officers thought Cornejo was trying to conceal something, failed to provide adequate supervision.[4] The CHP policy requiring a "medical examination," to Fairbrother, means bringing the prisoner to a medical facility with a physician, most likely an emergency room. How a person would appear to be in need of medical attention without "outward symptoms of illness or injury" would be "very circumstantial" but would include a serious car accident, poisoning or drug overdose, where a person might not show symptoms initially but "if you are aware that that's happened, then they're going to have to be medically cleared." Fairbrother testified that under the CHP policy, Cornejo was not required to incriminate himself by revealing he swallowed methamphetamine in order to get medical treatment. His

---

[4] The combination of circumstances Fairbrother discussed as indicating Cornejo swallowed drugs to avoid a felony charge were that he was pulled over in "an urban area known for drug use" for driving without headlights, "a classic sign of somebody under the influence"; the car smelled of alcohol; Diehl thought Cornejo might have taken a plastic baggie from his shoe and put it in his mouth; Cornejo chewed rapidly, resisted the officer, and tried to flee; there was no odor of gum or sign of gum wrappers; and a methamphetamine pipe and Brillo pad were found in the car.

17

opinions were based in part on the officers' observation of a plastic bag, which alarmed him because methamphetamine in a plastic bag would be "many servings." He acknowledged that Diehl was trying to help Cornejo get medical attention when he warned Cornejo he needed to tell the officers if he swallowed drugs, and that Cornejo could have requested medical attention without explanation and received it, and in fact declined medical attention for his shoulder.

Clarence Chapman, defendants' expert on law enforcement practices and procedures, testified there was no reason for Diehl to do further field sobriety tests after Cornejo's attempt to flee because Cornejo was already being arrested for resisting an officer and possession of drug paraphernalia and it would have been irresponsible for the officers to unrestrain him. Chapman testified that the officers determined Cornejo did not appear to be in need of medical attention and opined that the officers' decision to take Cornejo to the Glenn E. Dyer Detention Facility was reasonable.

## DISCUSSION

### I.

"A plaintiff in a negligence suit must demonstrate ' "a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury." ' (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 573.)" (*Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1083.) "The existence of a duty is a question of law, which we review de novo." (*Ibid.*)

Defendants argue that an officer has no legal duty to obtain a medical evaluation for an arrestee who is suspected of having ingested a controlled substance but declines medical assistance and shows no signs of drug ingestion while in the officer's custody.

"Public employees are liable for injuries resulting from their acts or omissions to the same extent as private persons, except where otherwise exempted or immunized by law. ([Gov. Code,] § 820.) Public entities are correspondingly liable for the negligent acts or omissions of their employees acting within the scope of their employment except where either the employee or the public entity is immunized from liability by statute. ([Gov. Code,] § 815.2.) . . . Where a legal duty is not created by statute, the question of whether a legal duty exists is analyzed under general principles of tort law." (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 264.)

" 'The most important of [the] considerations in establishing duty is forseeability. As a general principle, a "defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous." ' (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 434–435, quoting *Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 399.)" (*Giraldo v. Department of Corrections & Rehabilitation* (2008) 168 Cal.App.4th 231, 245 (*Giraldo*).) As will be further discussed, while there is generally no duty to come to the aid of another, such certain relationships do give rise to a duty of care. (*Giraldo*, at p. 245.)

Preliminarily, plaintiffs argue that defendants cannot disclaim the existence of a legal duty because they stipulated at trial to a jury instruction stating, "An officer has a duty not to increase the risk of harm to someone in his custody."[5]

---

[5] This argument was initially raised in a motion to dismiss this appeal, which we took under submission and now deny. The issues raised in the motion to dismiss will be addressed in this opinion.

Defendants argue they are not precluded from raising the issue of duty because they stipulated to the instruction above only after the trial court ruled against them on this issue in the context of their demurrer to plaintiffs' third amended complaint. In their demurrer, defendants argued that the cause of action for negligence failed to plead facts imposing a duty to take Cornejo anywhere other than jail. In opposition, plaintiffs argued that once Cornejo was taken into custody, a special relationship was created that imposed upon the officers a duty to arrange for medical attention when they saw Cornejo swallow a plastic baggie containing what they presumed to be a controlled substance. The trial court sustained the demurrer to the first cause of action with leave to amend "to allege a claim for negligence based solely on Government Code section 815.2" and stated, "the court is currently inclined to find that plaintiffs have alleged facts that, if true, may give rise to a duty pursuant to Government Code [section] 815.2. (See Third Amended Complaint paragraphs 10-21.)"[6] The fourth amended complaint contains the same allegations referenced in the trial court's order.

The jury instruction to which defendants agreed—which they do not challenge on this appeal—acknowledged the existence of a duty defined much more generally than the duty the parties dispute on this appeal. Defendants made clear in the trial court, through the demurrer and their trial brief arguing they had no duty to take Cornejo to the hospital given the absence of

---

[6] Further statutory references will be to the Government Code except as otherwise specified.

Section 815.2, subdivision (a), provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."

any signs of drug intoxication and Cornejo's refusal to accept medical attention, their disagreement with the claim that they had a duty to arrange for medical care in the circumstances of this case. Neither the jury instruction they accepted nor the statement in their brief that "[i]f a need for immediate medical care of an arrestee is apparent, the law imposes liability for a failure to summon such care" necessarily contradicts their argument that they did not have a duty to take Cornejo to the hospital.

Plaintiffs also contend defendants are precluded from arguing lack of duty because they did not make this argument during trial or in their motion for judgment notwithstanding the verdict. As just described, however, defendants did argue lack of duty in their demurrer; the trial court ruled against them. Plaintiffs point out that in argument to the jury, defendants described negligence as the "failure to use reasonable care to prevent harm to oneself or to others" and discussed the concept of reasonableness, but did not address the issue of duty. As the "existence and scope of duty are legal questions for the court" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477), it is not clear what plaintiffs think defendants should have argued to the jury on the issue of duty.

As to the judgment notwithstanding the verdict, plaintiffs cite *Lee v. West Kern Water Dist.* (2016) 5 Cal.App.5th 606, 635, which held that a party appealing the denial of a motion for judgment notwithstanding the verdict could not rely upon an argument not raised in the motion in the trial court. Here, however, defendants appealed from the judgment as well as from the order denying their motion for judgment notwithstanding the verdict. Their argument concerning the issue of duty is directed at the judgment, not at the order denying the motion for judgment notwithstanding the verdict.

21

Defendants argue that in the circumstances of this case, no duty is established by statute, by the special relationship doctrine or under the factors enumerated in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*).[7] In their view, no statute imposes a duty on officers to obtain medical care for an arrestee; no special relationship was created because the officers took no affirmative action increasing the risk to Cornejo, who created his own peril by swallowing the methamphetamine, and Cornejo did not detrimentally rely upon the officers for assistance; and there was no basis for the officers to override Cornejo's constitutional right to refuse medical treatment.

Plaintiffs point to the statutes generally making public employees liable in negligence to the same extent as a private person, and public entities liable if the employees were acting within the scope of their employment (Civ. Code, § 1714; Gov. Code, §§ 820, 815.2.)[8] Plaintiffs main argument, however,

---

[7] Civil Code section 1714, subdivision (a), provides: "Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself . . . ." *Rowland* explained that "[a] departure from this fundamental principle involves the balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland, supra,* 69 Cal.2d at pp. 111–113.)

[8] Plaintiffs additionally point to section 845.6, which provides in part, "a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." Plaintiffs recognize

22

is that once Cornejo was arrested, a special relationship was created that gave rise to a duty of care.

" 'As a rule, one has no duty to come to the aid of another. A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act.' (*Williams v. State of California* [(1983)] 34 Cal.3d [18,] 23.) More specifically, 'law enforcement officers, like other members of the public, generally do not have a legal duty to come to the aid of [another] person . . . .' (*Lugtu v. California Highway Patrol*, *supra*, 26 Cal.4th at p. 717.)" [¶] Liability may be imposed if an officer voluntarily assumes a duty to provide a particular level of protection, and then fails to do so (see *Williams*, . . . at pp. 23–24 & fn. 3; *Baker v. City of Los Angeles* (1986) 188 Cal.App.3d 902, 908), or if an officer undertakes affirmative acts that increase the risk of harm to the plaintiff. (See *Benavidez v. San Jose Police Dept.* [(1999)] 71 Cal.App.4th [853,] 863; *Mann v. State of California* (1977) 70 Cal.App.3d 773, 780.)" (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128–1129.)

---

that this statute does not directly apply here, as the statutory definition of prisoner does not include an arrestee (§ 844 [" 'prisoner' includes an inmate of a prison, jail, or penal or correctional facility"]), but see it as "indicative of the scope of the duty of care towards persons in custody."

Defendants assert that the CHP Manual, which provides that "officers shall arrange for a medical examination whenever a prisoner appears to be in need of or requests medical attention, regardless of outward symptoms of illness or injury," does not create a duty because there is no evidence the CHP Manual was adopted pursuant to the state or federal Administrative Act. (*Minch v. Department of California Highway Patrol* (2006) 140 Cal.App.4th 895, 908; *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 720; Evid. Code, § 669.1.) Plaintiffs do not suggest the CHP Manual creates a statutory duty; they properly rely upon it as bearing on the question of breach of duty. (*Minch,* at p. 908; *Lugtu*, at pp. 720–721.)

In *Giraldo, supra,* 168 Cal.App.4th 231, we held there is a special relationship between a jailer and prisoner. "It has been observed that a typical setting for the recognition of a special relationship is where 'the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare.' (*Kockelman v. Segal* (1998) 61 Cal.App.4th 491, 499, citing Prosser & Keeton, Torts (5th ed.1984) § 56, p. 374.) Thus, and as our Supreme Court has noted, a special relationship has been found to exist between business proprietors such as shopping centers, restaurants, and bars, and their tenants, patrons, or invitees, and also between common carriers and passengers, innkeepers and their guests, and mental health professionals and their patients. (*Delgado* [*v. Trax Bar & Grill* (2005)] 36 Cal.4th [224,] 235–236.)" (*Giraldo,* at pp. 245–246.) "[I]mportant factors in determining whether a relationship is 'special' include vulnerability and dependence. Prisoners are vulnerable. And dependent. Moreover, the relationship between them is protective by nature, such that the jailer has control over the prisoner, who is deprived of the normal opportunity to protect himself from harm inflicted by others. This, we conclude, is the epitome of a special relationship, imposing a duty of care on a jailer owed to a prisoner." (*Id.* at pp. 250–251.)

The parties have not cited, and we are not aware of, any California cases discussing the special relationship concept in the context of an arrestee —an individual who has been taken into custody but not yet booked into a jail or other correctional facility. (See § 844.)[9] The Ninth Circuit, however,

---

[9] Under section 844, "a lawfully arrested person who is brought into a law enforcement facility for the purpose of being booked, as described in Section 7 of the Penal Code, becomes a prisoner, as a matter of law, upon his or her initial entry into a prison, jail, or penal or correctional facility, pursuant to penal processes."

24

recently applied our reasoning in *Giraldo* to the arrest context, predicting that the California Supreme Court would conclude a "similar relationship exists between a law enforcement officer and an arrestee in his custody in need of immediate medical attention." (*Winger v. City of Garden Grove* (9th Cir. Mar. 18, 2020) 806 Fed. Appx. 544.) *Winger* reversed a summary judgment in favor of the police department, finding there was a genuine factual dispute as to whether officers breached their duty of reasonable care to an arrestee by failing to take her to a hospital instead of jail, despite her refusal of medical care, where there was evidence from which a reasonable jury could have concluded the officers should have recognized the arrestee was displaying symptoms of a stroke, required immediate medical attention and was not capable of refusing medical care. (*Id.* at p. 546.) We agree that the same factors we discussed in *Giraldo* apply to the relationship between a law enforcement officer and arrestee: Once in custody, an arrestee is vulnerable, dependent, subject to the control of the officer and unable to attend to his or her own medical needs. Due to this special relationship, the officer owes a duty of reasonable care to the arrestee.

In framing the question as whether the officers had a duty to take Cornejo to the hospital rather than to jail, defendants muddle the distinctions between the existence and scope of duty and breach of the standard of care. Once Cornejo was in custody, he was subject to the control of the officers and no longer in a position to attend to his own medical needs. At this point, regardless of Cornejo's role in creating his predicament, the officers had a duty to use reasonable care in responding to the situation. Whether the officers should have recognized a need for immediate medical attention despite the absence of symptoms of drug use and Cornejo's disclaimers and rejection of offers of medical assistance was a question of fact, as was the

25

question whether the duty of care was satisfied by taking Cornejo to jail rather than the hospital.[10]  These were questions for the jury, not legal questions delineating the scope of the duty.

Defendants attempt to distinguish *Giraldo*, and argue no special relationship existed here, because Cornejo refused repeated offers of medical attention and did not appear to be in medical distress.  Unlike the prisoner in *Giraldo*, who had no ability to protect herself from attacks by her cellmate that she had repeatedly reported to prison employees, defendants argue, Cornejo was not deprived of his "normal opportunities to obtain medical attention."  This argument ignores the obvious import of Cornejo being placed under arrest:  He was dependent upon the officers for medical assistance.  Moreover, according to the evidence at trial, he could not obtain such assistance without admitting his commission of the crime of possession of a controlled substance.  Defendants' focus on Cornejo's constitutional right to

---

[10] Defendants contend that if they had any duty to Cornejo, it was satisfied by taking him to the jail, where medical personnel would be on site, and informing the intake deputy of the circumstances of the arrest.  They acted reasonably, they maintain, by offering Cornejo medical attention, warning him there could be adverse consequences if he had swallowed drugs, offering him medical attention when he complained of pain after being taken to the ground and handcuffed.  They point out that the officers called a supervisor to the scene, who also interviewed Cornejo and offered medical attention; that the supervisor directed Hazelwood to tell the intake officer at the jail that Cornejo had swallowed something he claimed to be gum, and Hazelwood did so; that the intake deputy noted Cornejo might have taken drugs but did not summon a nurse to the intake gate; that jail personnel had a statutory duty to provide medical care if they knew or had reason to know Cornejo was in need of immediate medical care; and that Cornejo was lucid and showed no signs of drug intoxication while in CHP custody.

reject medical treatment thus obscures his constitutional right against self-incrimination.[11]

Defendants' other attempts to avoid liability also overlook the consequence of Cornejo's custodial status. Defendants rely upon *Hernandez v. City of San Jose* (1993) 14 Cal.App.4th 129, 135, to argue officers do not enter a special relationship with an individual against whom they have taken law enforcement action. In that case, after being stopped for driving without a license and having the car in which they were driving impounded, teenagers arranged for a ride home and were injured in a car crash. *Hernandez* held the officers had no duty to take charge of or make arrangements for the teenagers, and did not create a peril for them by

---

[11] Defendants point to *Jauregui v. Superior Court* (1986) 179 Cal.App.3d 1160, in arguing that involuntary medical treatment of an arrestee violates the arrestee's constitutional rights even where he or she may have ingested a large quantity of drugs. In that case, officers with a warrant to search an individual and his residence observed him swallow what they suspected to be balloons containing heroin. (*Id.* at pp. 1162–1163.) He was arrested for possession of narcotics paraphernalia found in his motel room and taken to a hospital where, after refusing medical treatment and nevertheless being subjected to X-rays that showed balloons in his stomach, he was confronted with a telephonic search warrant and told it authorized administration of an emetic to cause him to vomit. (*Id.* at p. 1163.) He drank the required solution and five balloons were recovered after he regurgitated. (*Ibid.*) *Jauregui* held suppression of the evidence was required because the search warrant in fact did not authorize the bodily intrusion to which the arrestee was subjected. (*Id.* at pp. 1164–1167.)

The present case does not involve an involuntary bodily intrusion intended to recover evidence of a crime. According to the evidence at trial, if Cornejo had been taken to the hospital and declined treatment, he would have been held for observation unless and until sufficient time passed to be sure he was not in danger or he exhibited symptoms of toxicity such that he became unable to make informed medical decisions. The *Jauregui* court did not consider any question of the arresting officers' civil tort liability.

27

impounding the car.  The enforcement action in *Hernandez,* as here, was stopping a vehicle for a traffic violation; the difference is that the present case resulted in a custodial arrest.

Defendants' reliance upon *Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 201 (*Davidson*), for the proposition that officers do not increase the risk of harm by failing to act on their suspicion that an individual may be injured in the future is also unpersuasive.  The officers in *Davidson* failed to warn or protect a woman they saw in a laundromat with a person suspected of previous stabbings.  (*Id.* at p. 201.)  They were held not liable for failing to prevent the attack that ensued because their knowledge of the danger did not give rise to a special relationship between the victim and the officers.  (*Id.* at pp. 208–209.)  The officers' awareness of potential danger to a member of the public in *Davidson* is entirely different from arresting officers' awareness that a person they have taken into custody may suffer harm from actions the officers observed the arrestee taking.

Nor is defendants' case supported by *Lehto v. City of Oxnard* (1985) 171 Cal.App.3d 285, 291, which held that officers who failed to prevent a drunk driver from continuing to drive were not liable to another driver subsequently injured in a collision with the drunk driver.  Defendants note *Lehto*'s description of *Davidson* as holding that "a police officer does not act affirmatively to increase the risk of harm by failing to stop an individual from acting dangerously." (*Lehto,* at p. 291, quoting *Davidson,* at pp. 208–209.) Plaintiffs are not seeking to impose liability for defendants' failure to prevent Cornejo from taking dangerous action; their claims are based on the officers' response in the face of dangerous action they suspected he had already taken. *Lehto*'s holding that there was no special relationship between the officers and the victim of an accident caused by a person the officers had previously

28

stopped for a traffic violation says nothing about the relationship between a law enforcement officer and a person they have taken into custody.[12]

## II.

Defendants contend the trial court erred in denying their motion for judgment notwithstanding the verdict because their failure to take Cornejo to the hospital was not a proximate cause of his death. "A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) On appeal, "[a]s in the trial court, the standard of review is whether any substantial evidence— contradicted or uncontradicted—supports the jury's conclusion." (*Ibid.*)

Proof of the causation element of negligence requires the plaintiff to establish that the defendant's breach of duty was a substantial factor in bringing about the harm. (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 481 (*Leslie G.*).) " 'The concept of proximate or legal cause has "defied precise definition." [Citations.] . . . [¶] Whether a defendant's conduct actually caused an injury is a question of fact [citation] that is ordinarily for the jury [citation]. . . . Our Supreme Court has . . . observed that the "substantial factor" test generally subsumes the "but for" test. [Citation.] [¶] However the test is phrased, causation of fact is ultimately a matter of probability and common sense. . . .' (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 252–253.) 'The substantial factor standard is a relatively broad one, requiring only that the contribution of the

---

[12] Having concluded defendants had a special relationship with Cornejo creating a duty of care, we need not address defendants' argument that there was no duty under the *Rowland* factors. (*Rowland, supra,* 69 Cal.2d 108.)

individual cause be more than negligible or theoretical.'  (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 978.)  Even 'a very minor force' that causes harm is considered a cause in fact of the injury.  (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79.)  However, ' "a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about [the] injury . . . is not a substantial factor" . . . .'  (*Ibid.*)"  (*Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 744.)

Defendants argue there could be no reasonable inference of causation from the evidence presented at trial.  They emphasize that where plaintiffs rely upon circumstantial evidence, they must prove the inferences favorable to their case are "*more reasonable or probable* than those against" them, not just that the favorable inferences are consistent with their theory of the case.  (*Leslie G., supra,* 43 Cal.App.4th at p. 483.)  "Although proof of causation may be by direct or circumstantial evidence, it must be by 'substantial' evidence, and evidence 'which leaves the determination of these essential facts in the realm of mere speculation and conjecture is insufficient.' "  (*Id.* at p. 484, quoting *Showalter v. Western Pacific R. R. Co.* (1940) 16 Cal.2d 460, 471.)

Defendants argue that plaintiffs' case depended on their assertion that Cornejo swallowed a plastic baggie, in order to support the inference that the amount he swallowed was large enough to be lethal.  Defendants argue the evidence was insufficient to prove the existence of such a baggie:  The medical examiner did not find a plastic baggie or remnants of one at the autopsy, the officer who saw vomit on the floor of the holding cell testified that he thought it contained bologna but did not say he saw a plastic baggie, and all the officers at the scene of the arrest testified they did not see or hear reference to a plastic baggie.  Defendants dismiss the significance of the two sentences in the declaration of probable cause describing Bruno and Hazelwood

30

observing Cornejo put "what looked like a plastic baggie" in his mouth and Diehl instructing Cornejo to "spit out the bag" because of the officers' testimony to the contrary and Bruno's testimony that the statements he drafted were a mistake. In addition to the absence of evidence a baggie existed, defendants maintain, there was no basis in the evidence for a reasonable inference that Cornejo would have consented to medical treatment if the officers had taken him to the hospital, as he had rejected all offers of medical care from the officers.

Assuming for purposes of discussion that the existence of a baggie was critical to plaintiffs' case, the probable cause declaration was evidence that officers saw Cornejo put a plastic baggie in his mouth. Although subsequently repudiated, the statements that Bruno and Hazelwood saw "what looked like a plastic baggie" and that Bruno heard Diehl instruct Cornejo to spit out "the bag" were unequivocal and made under penalty of perjury. The jury also heard deposition testimony in which Diehl seemed to acknowledge (albeit somewhat ambiguously) having seen a plastic baggie in Cornejo's mouth.[13] There was a direct conflict between this evidence and the testimony of the officers at trial that none saw or heard reference to a plastic baggie. This conflict in the evidence was for the jury to resolve. Defendants cannot simply assert that because the officers' claimed the probable cause declaration was erroneous, it had to be rejected as evidence.

Contrary to defendants' apparent assumption, plaintiffs' case did not depend on an unsupported inference that if taken to the hospital Cornejo would have consented to treatment. Both medical experts testified that an

---

[13] Diehl was asked at his deposition, "In your mind's eye, do you recall a plastic baggie being in Cornejo's hand?" He responded, "Not in his hand. If I was giving descriptions, it is what I observed in his mouth."

arrestee brought to the hospital due to suspected ingestion of a controlled substance, in the absence of consent to treatment, would be held for observation. Both testified that if and when the arrestee became too impaired to make informed decisions about medical treatment, procedures could be instituted to permit medical personnel to provide treatment. Defendants maintain that plaintiffs' expert wrongly assumed Cornejo's consent would not be needed for treatment "once signs of drug toxicity have developed," but Dr. Cetaruk's testimony in fact tied the "signs and symptoms" to the person being "greatly disabled and not able to make an adequate decision because now they're intoxicated on the methamphetamine or whatever else they may have ingested." He explained that while a lucid person could decline treatment and "sign out against medical advice," "in the case of drug or alcohol impairment, the impairment of either the drug or the alcohol has precluded them from making an informed decision about their care." The situation he described was consistent with the testimony of defendants' expert, although in California two physicians must agree that a patient is incapable of understanding the situation and making informed decisions, whereas in Colorado the determination can be made by a single physician. Plaintiffs' theory of the case was that if Cornejo had been taken to the hospital, even if he did not consent to treatment, he would have been held for observation and, as symptoms of toxicity developed, treatment could have been provided.

Defendants argue that there is no substantial evidence Cornejo's probability of survival would have exceeded 50 percent at the point he either consented to treatment or became too incapacitated to refuse treatment. The argument is based on *Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1504–1505 (*Bromme*), which held that "California does not recognize a cause of

32

action for wrongful death based on medical negligence where the decedent did not have a greater than 50 percent chance of survival had the defendant properly diagnosed and treated the condition."

In *Bromme*, there was evidence that the defendant doctor should have diagnosed his patient's colon cancer in June 1980, and at various points thereafter, but the correct diagnosis was not made until January 1982. (*Bromme, supra,* 5 Cal.App.4th at p. 1494.) Medical testimony established that after June 1981, the patient's chance of survival dropped from 70 to 75 percent down to 40 percent or less. (*Id.* at p. 1495.) The trial court granted a defense motion for nonsuit as to claims of negligence after June 1981 because after that point it was more probable the patient died due to the cancer than due to anything the doctor failed to do. (*Id.* at p. 1496.) Affirming, *Bromme* explained that in order to prove the patient's death was " 'caused by' " the defendant's negligence, as required by the wrongful death statute (Code Civ. Proc., § 377.60), the plaintiff "had to establish a 'reasonable medical probability' that the negligence was sufficient of itself to bring about the death, i.e., the death was 'more likely than not' the result of the negligence. (*Bromme,* at pp. 1498–1499.) Since after June 1981, it was more likely than not the patient would die from the cancer even if she received proper medical care, the absence of proper care after June 1981 was "not of itself sufficient to bring about her death" and therefore not a substantial factor or cause in fact of the death. (*Id.* at pp. 1498–1499.)

Defendants recognize that Dr. Cetaruk, plaintiffs' expert, testified it was more likely than not Cornejo would be alive if the officers had taken him to the hospital rather than to jail, but argue his opinion does not constitute substantial evidence of causation because he wrongly assumed Cornejo's consent would not be needed for treatment once signs of drug toxicity

33

developed.  As just discussed, defendants' characterization is not accurate:
Dr. Cetaruk testified that a physician could override a patient's refusal of
treatment at the point the patient's drug intoxication rendered the patient
incapable of making informed decisions about medical care.  Dr. Cetaruk
recognized that arrestees in Cornejo's situation often will not cooperate with
treatment and therefore must be observed for 6 to 24 hours, until it becomes
safe to release them or they become sufficiently impaired for doctors to treat
them without their consent.  Unlike observation at a jail without full medical
facilities, observation at a hospital can result in immediate treatment at the
point an arrestee either consents or is found incapable of medical decision-
making.[14]  Dr. Cetaruk's opinion was based on his own experience with
patients who had ingested controlled substances and review of material
including the Oregon study of individuals who had ingested
methamphetamine opportunistically.  His opinion was substantial evidence
of causation.

### III.

One of plaintiffs' motions in limine sought to exclude evidence and
argument on comparative fault on the ground that tortfeasors take plaintiffs
as they find them, and Cornejo's conduct was not relevant to the question
whether defendants negligently caused additional harm by failing to take
him to the hospital.  The trial court granted the motion as to Cornejo's
ingestion of methamphetamine and denied it as to his post-ingestion
statements and conduct.

---

[14]  Dr. Cetaruk testified that an arrestee suspected of having swallowed
a controlled substance could be observed at a jail rather than a hospital "[i]f
there's a medical facility in jail that was capable of properly observing them."
Testimony at trial indicated that while nurses are on staff at Glenn E. Dyer
Detention Facility, physicians are not.

Defendants argue there was no legal reason to exclude Cornejo's intentional ingestion of methamphetamine as a cause of his death because that conduct was the beginning of the chain of events leading to the death and "[u]nder the comparative-negligence dispensation every party remains liable for his proportionate share of fault, whether his conduct is described as negligence or as willful misconduct." (*Southern Pac. Transportation Co. v. State of California* (1981) 115 Cal.App.3d 116, 121.)

In *Harb v. City of Bakersfield* (2015) 233 Cal.App.4th 606 (*Harb*), the plaintiff suffered a stroke while driving and drove his car onto a sidewalk. First responders did not immediately provide medical care because they mistook the plaintiff's symptoms for signs of intoxication and by the time he was taken to the hospital, he had suffered brain damage that left him unable to care for himself. (*Id.* at p. 609.) In a lawsuit alleging the first responders' delay exacerbated the consequences of the stroke, the defendants argued that the plaintiff was contributorily negligent for failing to take prescribed blood pressure medication that would have reduced the risk of the type of stroke he suffered. (*Id.* at pp. 615, 626.) Finding no California law on point, the *Harb* court framed its decision around the fact that California has "adopted the familiar principle of tort law that a 'tortfeasor takes the plaintiff as he finds him.'" Drawing an analogy to "the position of health care professionals who treat patients for injuries or conditions that were caused by the patient's negligence" (*id.* at pp. 625–626, quoting *Bowen v. Board of Retirement* (1986) 42 Cal.3d 572, 580), *Harb* surveyed caselaw and concluded that courts in other jurisdictions "generally agree that a patient's conduct *prior* to seeking medical attention should not be considered in assessing damages." (*Harb,* at p. 626.) "In contrast, most courts have held that the concept of contributory negligence can be applied to a patient's conduct that is concurrent or

contemporaneous with the physician's negligence." (*Ibid.*) *Harb* noted that California cases were consistent with the latter point. (*Id.* at p. 626, fn. 11.)

As explained in one of the cases discussed in the *Harb* opinion—a wrongful death suit against physicians who treated the plaintiffs' daughter for a drug overdose—" 'the focus in a medical malpractice case is on the injury caused by the negligent treatment, not the original injury that created the need for treatment.' " (*Harb, supra,* 233 Cal.App.4th at p. 627, quoting *Son v. Ashland Community Healthcare Services* (Or.App. 2010) 244 P.3d 835, 843.) "A patient who negligently injures himself is nevertheless entitled to subsequent nonnegligent medical treatment." (*Son,* at p. 843.) The present case is analogous: Plaintiffs sought to hold defendants liable for negligence in their response to Cornejo's ingestion of methamphetamine. His negligence in swallowing the drug was not relevant to the officers' response; his post-ingestion negligence was relevant. The trial court properly excluded evidence of the former and permitted the jury to consider evidence of the latter.

## IV.

Finally, defendants contend the trial court erred in allowing plaintiffs to present their theory that the officers attempted to coerce a confession from Cornejo by conditioning medical treatment on his admitting he swallowed a controlled substance. Defendants argue any subjective intention to secure Cornejo's confession to possession of a controlled substance was irrelevant because negligence is based on an objective standard, and permitting evidence and argument on the coercion theory allowed plaintiffs to argue their previously barred Bane Act claim in the guise of negligence.

Plaintiffs' complaint had alleged a cause of action under the Bane Act, which provides for civil actions against those who interfere or attempt to interfere "by threat, intimidation, or coercion, with the exercise or enjoyment

36

by any individual or individuals of rights secured by" the Constitution or laws of the United States or the State of California. (Civ. Code, § 52.1, subd. (b).) Earlier in the litigation, the trial court had sustained defendants' demurrer to this cause of action, ruling that plaintiffs "failed to allege any threat, intimidation, or coercion beyond decedent's detention itself." In the same ruling, the court prohibited plaintiffs from basing their negligence claim on "a purported violation of Civil Code [section] 52.1."

Based on the ruling sustaining the demurrer, defendants moved in limine to exclude evidence or argument that the officers attempted to coerce Cornejo's confession to drug possession. The trial court denied this motion, rejecting the argument that plaintiffs' coercion theory amounted to the previously barred Bane Act claim.[15] In the court's view, plaintiffs were claiming that attempting to coerce a confession by making it a condition of medical care was a violation of the officers' duty not to increase risk to a detained person.[16]

---

[15] Opposing the motion in limine, plaintiffs' counsel argued the jury needed to hear the facts surrounding the stop, including "whether medical treatment was offered, with or without a condition that Cornejo incriminate himself," but offered to stipulate that plaintiffs would not pursue a civil rights claim. Defendants' counsel urged plaintiffs' argument was just a different framing of the civil rights violation argument that had been rejected by the federal court and found lacking in the trial court's ruling on the demurrer to the Bane Act claim—that Cornejo's civil rights were violated by "deliberate indifference to serious medical needs." Defendants' counsel acknowledged officers have a duty not to do anything to increase the risk of harm or death to a person in custody and the standard at issue in a Bane Act claim is much higher than that in a negligence claim, but argued the coercion argument was based on the officers' subjective motivation, which is not relevant to a negligence claim.

[16] After plaintiffs' evidence was presented, they sought to amend the complaint to conform to proof by adding the Bane Act claim back in, based on the officers' testimony that everyone has a right not to self-incriminate and

37

We review the trial court's ruling on admissibility of evidence for abuse of discretion, which is shown only where the ruling " 'exceeded the bounds of reason, all of the circumstances being considered.' " (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 640, quoting *People v. DeJesus* (1995) 38 Cal.App.4th 1, 32.)

Emphasizing that the defendant's conduct in a negligence case is measured by the objective standard of a reasonable person (*Ford v. Gouin* (1992) 3 Cal.4th 339, 356), defendants maintain that the trial court erroneously rejected their argument that an officer's subjective intent is irrelevant in a negligence claim.  It did not.  The trial court agreed that the relevant issue was the officers' actions, not their "state of mind."  "The general standard of care is 'that of a reasonably prudent person under like circumstances.' " (*Orey v. Superior Court* (2013) 213 Cal.App.4th 1241, 1255, quoting *Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539, 546.)  Here, the circumstances described by the officers included their observations of Cornejo swallowing what they believed to be a controlled substance, their repeated admonitions that Cornejo needed medical attention if he swallowed a controlled substance and demands that Cornejo identify the substance, and Cornejo's repeated assertions that he swallowed gum and did not need medical attention.  To properly evaluate the officers' conduct—as well as Cornejo's, for apportionment of comparative fault—it was relevant for the jury to understand that Cornejo had an incentive to lie about what he ingested and decline medical care in order to avoid admitting the crime of

---

that medical assistance was offered to Cornejo contingent on his admitting he swallowed methamphetamine.  This request was initially presented as a motion for reconsideration of the ruling on the demurrer and denied by the judge who had ruled on the demurrer, who indicated the issue should be raised as a trial motion.  The trial judge denied the motion to amend.

38

possession of a controlled substance, and to assess whether and how a reasonable officer would have taken this into account in responding to the situation. We find no abuse of discretion.

## DISPOSITION

The judgment is affirmed. Costs are awarded to plaintiffs.

 

                            _____

                            Kline, P.J.

We concur:

_____

Stewart, J.

_____

Miller, J.

*Frausto et al. v. California Highway Patrol et al.* (A156552)

Trial Court:                        Alameda County Superior Court

Trial Judge:                        Hon. Evelio M. Grillo


Attorneys for Plaintiffs and        Bracamontes & Vlasak
Respondents                         Michael R. Bracamontes
                                    Ryan J. Vlasak

Attorneys for Defendants and        Attorney General of California
Appellants:                         Xavier Becerra

                                    Danielle F. O'Bannon
                                    Senior Assistant Attorney General

                                    Jeffrey R. Vincent
                                    Supervising Deputy Attorney General

                                    Amy W. Lo
                                    Deputy Attorney General